**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jackie K. STEELE, Defendant–Appellant.**

**No. 94–3709.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1995.

Decided Aug. 7, 1996.

Philip P. Simon (argued), Office of the United States Attorney, Hammond, IN, for Plaintiff–Appellee.

Edward M. Genson (argued), Marc W. Martin, Genson, Steinback, Gillespie & Martin, Chicago, IL, William J. O'Connor, Chicago, IL, for Defendant–Appellant.

Before KANNE, and DIANE P. WOOD, Circuit Judges, and SKINNER, District Judge.[*]

---

* Hon. Walter Jay Skinner of the District of Massa- chusetts, sitting by designation.

SKINNER, District Judge.

The defendant Jackie K. Steele was convicted after a jury trial of the offenses of malicious damage to property by means of an explosive (gasoline), 18 U.S.C. § 844(i); mail fraud, 18 U.S.C. § 1341; and witness tampering, 18 U.S.C. § 1512(b)(1). He appeals from his convictions and sentences, and from the denial of his motion for a new trial. As grounds for his appeal he asserts that the evidence was insufficient to warrant the guilty verdicts; that the statement of Jeff Bunting was hearsay and erroneously admitted in evidence; that the misconduct of the prosecution in failing to disclose evidence potentially useful to the defendant prevented the defendant from getting a fair trial; and that the defendant did not receive downward departures in sentencing to which he was entitled.

## SUMMARY OF THE EVIDENCE

The defendant was a wholesaler of used cars. He would buy used cars at auto auctions and place them on consignment with various used car dealers for resale, splitting the proceeds with the dealer. He had a friend of long standing named Gerald Altier. In November of 1989, Altier and one John Zaragoza opened an auto dealership in Gary, Indiana, called Zaragoza Oldsmobile. Altier furnished the bulk of the cash to set up the dealership, and became its manager. The dealership was seriously underfunded, having only $100 in available cash on opening day. Consequently, it was in constant financial difficulty.

The defendant placed many used cars on consignment to Zaragoza Oldsmobile, which were sold in due course. The cars remained the property of the defendant until they were sold, at which time the defendant would furnish the appropriate title documents.

At various times during the following year, the defendant lent money to Zaragoza Oldsmobile to enable the dealership to meet its payroll and other operating expenses. These loans were secured by a pledge of General Electric stock worth $67,000. Prior to November, 1990, these loans had been paid and the stock returned. In November, 1990, the

defendant made a loan of $24,000 to the dealership, and in December he again received the same General Electric stock as security therefor. By December, 1990, the dealership was many hundreds of thousands of dollars in debt. It had not paid its employees or its suppliers, or General Motors Acceptance Corporation (GMAC), which had financed its inventory. It did, however, renew its insurance policy, and John Zaragoza in fact increased the coverage by adding $400,000 of business interruption insurance. The down payment on the premium was paid by the defendant. The first installment of the premium was paid in cash by Altier on December 21, 1990.

At the end of December, 1990, the defendant had approximately 25 used cars at the dealership, but as usual had furnished no invoices or title documents. These cars were of generally low value; some were so-called "clip" cars, made up of the back end of one car welded to the front end of another; some were inoperable.

Gerald Altier testified that he, John Zaragoza and the defendant agreed that the defendant would set fire to the dealership in order to collect the insurance, and that the insurance would cover the defendant's cars. On December 22, the defendant came to the dealership and delivered invoices for all of his cars to the bookkeeper, who entered them in the dealership purchase journal. The prices assigned to the cars in these invoices were seriously inflated over their true value, and these inflated values were entered on the books of Zaragoza Oldsmobile. Altier testified that this was for the purpose of creating the illusion that Zaragoza Oldsmobile owned the cars. According to Altier, the defendant assigned the value for each car. The defendant testified, however, that this procedure was carried out at the direction of Altier in order to comply with the insurance company's end-of-the-year reporting requirements, and that Altier assigned the values. It is not clear that this bookkeeping would have been effective to bring the cars under the coverage of the dealership's insurance, in the absence of title documents. This question was never resolved, because the cars were seized some

time later by GMAC in satisfaction of its liens. At that time the defendant claimed to GMAC that the cars were his.

Also, on or about December 22, 1990, Altier purchased seven junk cars at an auction, using the defendant's dealer's license. These vehicles were added to Zaragoza Oldsmobile's inventory at prices inflated up to four times their cost.

It was the defendant's habit while in the Chicago area to stay at either the D–Lux Budget Motel or the Budgeteer Motel. On December 26, 1990, however, he asked his friend Ron Delisi to get him a motel room. Delisi secured a room in his own name at the Terrace Motel in Oak Forest, Illinois, a short distance from Gary, Indiana. While there was no evidence that the defendant directed Delisi to choose that motel or to use his own name, he did not correct the name when he registered at the motel later that day.

On December 27, the security guards who had previously protected Zaragoza Oldsmobile were fired. Later that afternoon, Altier ordered that all of the cars on the lot should be placed inside the building in order to facilitate snow removal from the lot. This move was contrary to prior practice. He ordered that the defendant's cars were to go in first. This turned out to be very hard work, because it was cold and snowing, and many of the cars would not start and had to be towed or pushed. An employee named Bunting complained to Altier about doing this work, and asked Altier what was going on. According to Bunting, Altier eventually replied that the dealership premises were about to be blown up, and that the defendant would take care of it.

At 5:31 a.m. on December 28, 1990, an alarm rang at the Gary Fire Department station directly across from Zaragoza Oldsmobile. A glow was visible in the window of the dealership, caused by a flare which had been burning for an indeterminate time. The firemen immediately extinguished the flare. The premises and the automobiles were awash with gasoline, presumably from five new six gallon gasoline cans and one five gallon can found inside. Windows had been opened to provide oxygen for the fire, but the ventilation was insufficient to ignite the gasoline vapor, i.e., the mixture was "too rich." If the quantity of gasoline present on the premises had ignited, there would have been a tremendous explosion, but, as it was, the damage was relatively slight.

The government introduced records of telephone calls to and from the room occupied by the defendant at the Terrace Motel:

12/27/90—7:06 a.m. to Altier. Defendant dunned Altier for repayment of the $24,000 owed to him by Zaragoza Oldsmobile. 0.4 minute.

12/27/90—1:55 p.m. from Nancy Vallone, one of the defendant's girlfriends. 1 minute. (As a result of this call, Ms. Vallone arrived later in the afternoon with Christmas cookies, and they "made love," according to the defendant.)

12/27/90—8:12 p.m. from Zaragoza Oldsmobile. 1 minute.

12/27/90—8:21 p.m. to Romayne Baker, the defendant's former girlfriend's new boyfriend. This was a harassing "hang-up" call. 30 seconds.

12/27/90—10:14 p.m. to Betty Bulsma (probably the girlfriend of Ron Delisi). 4.5 minutes.

12/27/90—10:19 p.m. to Romayne Baker, another "hang-up." 30 seconds.

12/27/90—10:51 p.m. to Romayne Baker, same as above.

12/28/90—1:07 a.m. to Romayne Baker, same as above.

12/28/90—2:05 a.m. to Romayne Baker, same as above.

12/28/90—5:59 a.m. to Romayne Baker, same as above.

12/28/90—6:00 a.m. to Gerald Altier. 2.3 minutes. Altier testified that the defendant told him that the planned arson had failed. Altier then rolled over and went back to sleep. The defendant testified that this was yet another dunning call to get the $24,000 owed him by Zaragoza Oldsmobile.

12/28/90—7:38 a.m. to Betty Bulsma. 30 seconds.

12/28/90—9:07 a.m. to Altier. 0.7 minutes.

12/28/90—9:47 a.m. to Altier. 1.8 minutes.

12/28/90—11:02 a.m. to Betty Bulsma. 30 seconds.

12/28/90—11:19 a.m. to Romayne Baker. 30 seconds.

12/28/90—2:28 p.m. from Zaragoza Oldsmobile. One minute.

The government points out that the period of telephone silence between 2:05 a.m. and 5:59 a.m. encompasses the period during which the burning flare was discovered at Zaragoza Oldsmobile.

After the defendant learned that the fire was being investigated by the FBI, he contacted several people and told them that he was home in Alabama at the time of the fire. He persuaded Ron Delisi to lie to FBI agent Dunn telling him that it was he, Delisi who had been in the Terrace Motel from the 26th through the 28th of December, and that the defendant was in Alabama during that time.

The defendant also tried to persuade Nancy Vallone to testify that she had spent the afternoon of December 27, 1990, at the Terrace Motel with Ron Delisi. In her initial interview, she lied to the FBI about her rendezvous with the defendant. The defendant kept in touch with Vallone and encouraged her to maintain the lie. When Vallone was eventually subpoenaed to a grand jury, she decided to tell the truth, although by this time the defendant was trying to persuade her to testify that she had no recollection of seeing the defendant at the critical time. The defendant said to Vallone that "if the FBI could prove that he was in town that day, he would be fucked." She had previously asked him if he had done the things he was accused of, and he had nodded his head up and down.

The defendant's principal defense was an alibi. He claimed that he had spent the early morning of the 28th in his room at the Terrace Motel playing a card game with Laurie Hutchinson, a part time waitress at Traverso's Restaurant. Hutchinson corroborated his testimony, saying that she was with the defendant in his room from 1:00 a.m. until 5:45 a.m. on the morning of December 28th.

## DISCUSSION

### A. *Sufficiency of the evidence.*

 The defendant argues that the evidence was insufficient to support his conviction because the government's case depended on the testimony of an unreliable witness, the co-conspirator, Altier. Even if Altier's testimony were uncorroborated, his credibility was a question for the jury, and the jury apparently believed him. *United States v. Henderson,* 58 F.3d 1145, 1148 (7th Cir.1995). The defendant argues further that his conviction should be set aside because parts of Altier's testimony are inherently incredible. First he asserts that it was physically impossible for him to have driven from Zaragoza Oldsmobile to the Terrace Motel on the morning of the 28th between the time that the flare was put out and the 6:00 a.m. telephone call to Altier in which Altier says the defendant reported that the arson attempt had failed. The fire department responded at 5:31 a.m. and the flare was put out some time after that, leaving less than 28 minutes to make the trip, get to the motel room, call Romayne Baker, and then call Altier. Agent Dunn had timed the trip on a Friday afternoon at 33 minutes. No physical impossibility is established by this evidence. Traffic on a Friday afternoon is not the same as early on a Friday morning. (December 28, 1990 was a Friday.) There is no evidence that the defendant would have waited around for the fire department to come on the scene before heading back to the motel. The flare had been burning for an indeterminate time when the fire department arrived; as soon as the expected immediate ignition did not occur, it would be clear that the attempted arson had failed. This was clearly a jury issue.

The defendant says further that it is inherently incredible, as a matter of human nature, that he should, upon returning from a failed arson attempt, first make a harassing call to his former girlfriend's new boyfriend before reporting the failed arson to his co-conspirator. And it was further inherently incredible that the co-conspirator, Altier, as he said, on receiving the report, should roll-over and go back to sleep. This was certainly odd behavior on the part of both partici-

pants, but a jury could easily believe that neither one of these men had his priorities very well tuned.

The defendant has failed to demonstrate that the evidence against him was incredible as a matter of law as we have defined the term in our cases. *United States v. Henderson,* 58 F.3d at 1149; *United States v. Wallace,* 32 F.3d 1171, 1173 (7th Cir.1994). The evidence was more than sufficient to support the conviction.

## B. *Testimony of Bunting.*

 Bunting testified that while he was helping Altier put the defendant's used cars into the Zaragoza showroom, Altier said that the place was going to be blown, and that the defendant would take care of it. While out-of-court statements are ordinarily inadmissible as hearsay, it is well established that out-of-court statements of a co-conspirator made in the course of and in furtherance of the conspiracy are admissible. *United States v. Lindemann,* 85 F.3d 1232 (7th Cir.1996). Altier's comment to Bunting is such a statement, and was properly admitted.

## C. *Prosecutorial misconduct.*

 Laurie Hutchinson testified that on the evening of December 27 she was at Traverso's restaurant as a patron, not as an employee; she had not worked at Traverso's that day. She then went to the defendant's motel room at about 1:00 a.m. on the 28th and played cards with him until 5:45 a.m. The prosecutor cross-examined her as follows:

Q Were you working the night of December 27th?

A No, I was not.

Q You sure you weren't working the night of December 27th?

A I don't think so.

Q Was your name at the time Laurie Gougliardo?

A Yes, it was.

At this time, the prosecutor had a paper in his hand which he attempted to offer, purporting to show that Hutchinson had worked at Traverso's on the 27th. Defense counsel pointed out that the offered record was for a year other than 1990. At a bench conference, an FBI agent told the judge that Traverso had told him that Hutchinson had worked on December 27th, 1990, from 5:46 p.m. until 9:01 p.m. The prosecutor told the judge that he would have Traverso in court to so testify. Traverso was brought to the court house, but when he arrived he told the prosecutor that he had made a mistake, and that his record was for a year other than 1990. The prosecutor then sent Traverso home without telling defense counsel that Traverso was at the court house, or what his testimony was. The defendant claims on appeal that the prosecutor's conduct deprived him of the opportunity to rehabilitate his principal witness after the prosecutor had tried to show the jury that he had impeaching evidence by waving a document around in his hand during the cross-examination recounted above.

The foregoing history was presented to the district judge at a hearing on the defendant's motion for a new trial. After a careful review of the testimony at the hearing and repeated reading of the trial transcript, the district judge concluded that the conduct of the prosecutor was reprehensible but was harmless in that it did not affect the outcome of the trial. We agree. The attempted impeachment of Miss Hutchinson was never completed and was on a collateral matter in any case, the supposed hours of work being totally irrelevant to the defendant's alibi. In our opinion it is highly unlikely that the prejudicial effect (if any) of the prosecutor's brandishing of an unidentified piece of paper was a determinative factor in the defendant's conviction, given the plethora of testimony.

## D. *Sentencing*

 The defendant appeals his sentence. The district judge assessed an offense level of 24 under U.S.S.G. § 2K1.4(a), on the basis that the defendant had knowingly created a substantial risk of bodily harm. The defendant claims that this was error, because there was no one present when the arson was committed. The judge correctly noted that there was a substantial risk to the fire fighters who would certainly attempt to extinguish the blaze, since Zaragoza Oldsmobile

was directly across from the firehouse. *See United States v. Foutris,* 966 F.2d 1158 (7th Cir.1992).

 The district judge also declined a downward departure because of the defendant's family situation and because his criminal history overstated his true background. It was within the district court's discretion to deny a downward departure, and it would be a rare event for an appellate court to interfere with its exercise. In any case, we find no abuse of discretion in this case.

### CONCLUSION

In our opinion there is no merit to the defendant's appeal. The conviction and sentence are AFFIRMED.