1998-NMSC-004

954 P.2d 45

**William JAYNES, Robert Jaynes, Linda Gray, and Carolyn Salter, Plaintiffs–Appellants,**

v.

**STRONG–THORNE MORTUARY, INC., a New Mexico corporation, d/b/a Fairview Memorial Park, Defendant–Appellee.**

No. 23154.

Supreme Court of New Mexico.

Nov. 13, 1997.

Rehearing Denied Feb. 10, 1998.

Warner & Finley, Charles R. Finley, Albuquerque, for Appellants.

Bradley & McCulloch, P.A., Gordon J. McCulloch, Rosemary Dillon, Albuquerque, for Appellee.

## OPINION

FRANCHINI, Chief Justice.

1 Kiro Arthur Jaynes died in February of 1994. His brother, William Jaynes, and his son Arthur Jaynes, arranged for the burial with Strong–Thorne Mortuary, doing business as Fairview Memorial Park. The Jaynes family owned a family plot at Fairview Memorial Gardens. In preparing the grave for Kiro, Strong–Thorne disturbed the grave of Vondaine Jaynes, William's mother. The surviving children of Vondaine Jaynes: William Jaynes, his brother, Robert Jaynes, and sisters, Linda Gray, and Carolyn Salter, sued Strong–Thorne Mortuary on claims of breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress, and prima facie tort.

2 Strong–Thorne moved for summary judgment on all the claims, and the district court granted the motion. Appellants moved the court to reconsider the grant of summary judgment. In particular, counsel provided a joint letter to the trial judge stating that "[c]ounsel agree that the defendant's motion for summary judgment was not based on a claim that plaintiffs have not suffered severe emotional distress, and, therefore, neither party has briefed or argued this issue during the proceedings on the defendant's motion for summary judgment, and neither party desires for the court to erroneously conclude that this issue should constitute a ground for upholding the court's decision to grant summary judgment to the defendant." The district court refused to vacate the summary judgment, and Appellants appealed to this Court. We affirm.

3 *Facts.* Following Kiro's death, his son, Arthur, asked William if Kiro could be buried in the family plot. It appears from the record that if William had not allowed the burial in the family plot at Fairview, Kiro would have been buried elsewhere. William was concerned that no other graves would be disturbed by preparing the unused grave site for Kiro's burial. The grave site was visited to examine the relationship of the adjacent graves and the unused grave site, and to assure that there was sufficient room. At the funeral home, during discussions concerning the cemetery contract for the burial of Kiro, William Jaynes specifically inquired of David C. Merrill, a managerial employee of Fairview, whether the grave for Kiro could be dug without disturbing the graves of any other family members who were buried nearby. Mr. Merrill represented to William Jaynes that no other graves would be disturbed, and that the headstone of another grave would be temporarily removed for additional clearance. In reliance upon this representation, William Jaynes allowed the family plot to be used for the burial of Kiro. The contract to bury Kiro was signed by Arthur, and he paid for the funeral.

4 Kiro's grave was dug with a backhoe, a spotter was not employed. Mr. Merrill testified, at his deposition, that when he acted as a backhoe operator he usually employed a spotter. He further testified that although at the time this grave was dug there was not a policy in place concerning the use of a spotter when a backhoe was used, in this case a spotter was not employed because the grave diggers "just forgot." The backhoe broke into the concrete liner and casket of the adjacent thirty-year-old grave of William's mother Vondaine Jaynes exposing her remains. Strong–Thorne did not notify the family of the damage done to their mother's grave. Although it was Strong–Thorne's policy to cover a newly dug grave site, that policy was not followed in this case. Both the newly dug grave, and the portion of Vondaine's grave which was uncovered, were left exposed.

5 On the following evening, Arthur went to the cemetery to view the grave site before the burial which was scheduled for the following morning. He discovered that the grave site had been left uncovered and that the adjacent grave of Vondaine had been damaged. He called both the police and William. The Fairview manager was also called. All of them came to the cemetery that evening to inspect the damage. William, however, was too upset to enter the cemetery. He asked one of his nephews to go with the police to view the damage to his mother's grave. The nephew came back and told him that the liner of his mother's casket had been damaged, and that her remains were exposed. According to a Funeral Ser-

vice Consultant who prepared a report concerning "the disturbance caused to Vondaine Jaynes' grave," Vondaine's feet and legs were exposed to view.

6 The manager, after inspecting the grave site, still failed to cover the grave before he left the cemetery, and he did nothing to prevent further disturbance. He returned the next morning to photograph the grave site and found that it had been further disturbed. Broken pieces of the liner from Vondaine's casket were in different positions than they had been the night before, and several beer cans were strewn about the area. The manager testified at his deposition that he knew that "people frequented the cemetery after hours" and, that because alcohol was sold across the street, he knew that people slept in the cemetery.

7 Temporary repairs were made to the concrete liner without consultation with or permission of the family, and Kiro's burial was held as arranged. Vondaine's children knew of the damage and disturbance to their mother's grave. Near the burial site they observed a truck with chunks of wood, concrete and other debris from their mother's grave. After the funeral service, William Jaynes asked the manager why the grave site was not covered after they left the previous evening and the manager answered that he had no excuse for failing to cover the open grave site. (R.P. 128, 154).

8 Strong–Thorne refunded Arthur the costs of his father's burial. Vondaine Jaynes was disinterred in November 1994. Her remains were placed in a new coffin, the concrete liner was replaced, and the remains were reinterred.

9 *Standard of Review.* Summary judgment is proper when no issues exist as to any material fact, and "only the legal effect of the undisputed facts remains to be decided...." *Ruiz v. Garcia,* 115 N.M. 269, 272, 850 P.2d 972, 975 (1993); *see* Rule 1–056 NMRA 1997. In reviewing an appeal from an order granting summary judgment, this Court examines the record to determine whether triable issues of material fact exist. *Gillin v. Carrows Restaurants, Inc.,* 118 N.M. 120, 122, 879 P.2d 121, 123 (Ct.App.1994). An award of summary judgment will be upheld if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Koenig v. Perez,* 104 N.M. 664, 665–66, 726 P.2d 341, 342–43 (1986). We consider the merits of each of the issues raised in this appeal "in the aspect most favorable to support a trial on the issues because the purpose of summary judgment is not to preclude a trial on the merits if a triable issue of fact exists." *Ruiz,* 115 N.M. at 271, 850 P.2d at 974.

■ 10 *Contract.* William Jaynes claims that a contract was formed, between him and Strong–Thorne, at the time he went to the funeral home with Arthur and agreed to allow his brother to be buried in the family plot. Although he could have insisted that his brother be buried elsewhere, he agreed to allow Strong–Thorne to arrange the burial, based on assurances from their manager that no other grave site would be disturbed. Strong–Thorne responds that any claim by William Jaynes, that a contract was formed at the time arrangements were made for Kiro's funeral, must fail for lack of consideration. Strong–Thorne argues that because it had a pre-existing duty to care for the family plot, any representation by them that other graves would not be disturbed concerned an obligation they were already bound to perform. Because of this pre-existing duty there was inadequate consideration to form a contract.

■ 11 Under the pre-existing duty rule, where a party does or promises to do what he is legally obligated to do or promises to refrain from doing or refrain from doing what he is not legally privileged to do he has not incurred detriment. It is clear that if a party does only what he is legally obligated to do or less he is not suffering legal detriment because he is not surrendering a legal right.

Joseph Calamari, *Contracts* § 4–9(a) (3rd ed.1987). Courts have created exceptions to the pre-existing duty rule. *Id.* The Uniform Commercial Code and other legislation permit a contractual modification without consideration. *Id.* at § 5–14. However, we are not aware of any exception that would apply in this case.

**12** Strong–Thorne argues that since Arthur signed and paid for Kiro's funeral, a contract existed between it and Arthur only. It is Strong–Thorne's position that a contract was never created between them and William Jaynes concerning Kiro's burial. Although Strong–Thorne argues that there was no breach of their contract with Arthur, they argue that even if there was a breach, only Arthur, who is not a party to this litigation, could recover damages.

**13** There is substantial evidence that a question of fact exists whether Strong–Thorne breached its contract with Arthur. In New Mexico there exists a duty of good faith and fair dealing exists in every contract. "The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." *Continental Potash, Inc. v. Freeport–McMoran Inc.*, 115 N.M. 690, 706, 858 P.2d 66, 82 (1993) (citation omitted). Although negligent conduct is not sufficient to constitute a breach of the covenant, *Paiz v. State Farm Fire and Cas. Co.*, 118 N.M. 203, 213, 880 P.2d 300, 310 (1994), "affronts where the breaching party is consciously aware of, and proceeds with deliberate disregard for, the potential harm to the other party" are sufficient. *Id.* (footnote omitted).

14 Strong–Thorne argues that the burial of Kiro was performed in a satisfactory manner, and that there were no damages associated with that burial. However, the contract was for the opening and closing of a grave site, and, during the opening of the grave, services were performed improperly.

**15** A contract for a burial concerns more than the interment of a body. Families contract for funeral services during a time of intense emotional pain when planning the details of a burial would be difficult for them to perform themselves. In advertising their services funeral homes regularly claim that their services will ease the pain of the family. "Contracts for funeral and burial services are imbued by the very nature of their subject with certain expectations to be implied in fact unless specifically disclaimed." *Flores v. Baca*, 117 N.M. 306, 311, 871 P.2d 962, 967 (1994).

16 We do not believe that the contract for the burial of Kiro can be considered to have been performed satisfactorily. There are allegations that: a spotter should have been employed during the use of the backhoe, during the course of opening Kiro's grave his mother's remains were disturbed, Strong–Thorne employees did not notify the family of the disturbance, and knowing of the family's special sensibilities concerning the disturbing of other graves did not consult with the family on how best to proceed in correcting the disturbance once it occurred. It is particularly disturbing that having viewed the damage, and knowing that it was not unusual for inebriated persons to trespass on the land, the manager did nothing to protect the area. The presence of beer cans, and evidence of the further disturbance of the grave the following day, could have been prevented by simply placing a sheet of plywood over the open grave. Finally, allowing debris from Vondaine's coffin to remain in view during the burial of Kiro demonstrated a great lack of respect for the feelings of family members at a very difficult time.

**17** *The surviving children of Vondaine Jaynes were third-party beneficiaries of the Arthur/Strong-Thorne contract.* Family members are third-party beneficiaries of a funeral contract. *Flores v. Baca*, 117 N.M. at 311, 871 P.2d at 963. In *Flores*, the decedent was improperly embalmed. *Id.* at 308, 871 P.2d 962. The decedent and his wife had entered pre-need funeral contracts which included embalming. The wife had insisted on the embalming because of a traumatic event she had experienced when her father died. Although it was the wife who "negotiated for embalming" and only one of the decedent's daughters who "signed the final contract," *id.* at 310, 871 P.2d 962, we found that all of the decedent's thirteen children were third-party beneficiaries of the funeral contract. "[I]t is common knowledge that contracts for funeral services are intended to benefit the family of the deceased." *Id.* at 310, 871 P.2d 962. "Such intent must appear either from the contract itself or from some evidence that the person claiming to be a third-party beneficiary is an intended bene-

ficiary." *Id.* at 311, 871 P.2d 962, *quoting Valdez v. Cillessen & Son, Inc.*, 105 N.M. 575, 734 P.2d 1258 (1987). In this case, William Jaynes and his brother and sisters were family members; it was their brother who was being buried. We hold that they were third-party beneficiaries of the contract between Arthur and Strong–Thorne. However, we affirm the trial court's grant of summary judgment since there were no damages arising from the breach of this contract, a contract for the opening and closing of Kiro's gravesite. It is fundamental that judgments are intended to compensate the successful litigant for harm done. Arthur Linton Corbin, *Corbin on Contracts* § 990 (1964). Here, however, Vondaine's coffin has been replaced and she has been reinterred. Arthur was reimbursed the cost of his father's burial.

█ 18 *Intentional Infliction of Emotional Distress.* Appellants claim that the district court erred in granting summary judgment for intentional infliction of emotional distress because Appellants presented material evidence in support of this cause of action. Intentional infliction of emotional distress arises when a defendant intentionally or recklessly causes severe emotional distress through extreme and outrageous conduct. *Dominguez v. Stone*, 97 N.M. 211, 214, 638 P.2d 423, 426 (Ct.App.1981) (citing *Restatement of Torts* § 46 (1965)).

█ 19 We do not believe that Strong–Thorne's conduct was extreme and outrageous. "Extreme and outrageous conduct is that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person." Rule 13–1628 NMRA 1997.

█ 20 To recover emotional distress damages, those damages must be "severe." *Flores v. Baca*, 117 N.M. at 313, 871 P.2d at 969. By "severe" we intend that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." *Folz v. State*, 110 N.M. 457, 469, 797 P.2d 246, 254 (1990); Rule 13–1628 NMRA 1986. The facts of this case do not support a find-

ing of intentional infliction of emotional distress based on this objective standard.

█ 21 *Negligent infliction of emotional distress.* In *Flores v. Baca* we explained that "[t]here exists in New Mexico no recognized cause of action for negligent infliction of emotional distress except for bystander liability." 117 N.M. at 310, 871 P.2d 962. Appellants, citing *Acosta v. Castle Constr.*, 117 N.M. 28, 868 P.2d 673 (Ct.App. 1994), argue that it is not always necessary to show a visual observation of the wrongful conduct to establish bystander liability, and, that they had a contemporary sensory perception of the events giving rise to the claim sufficient to qualify as bystanders. It is correct that a person may be considered a bystander for the purpose of negligent infliction of emotional distress without a visual observation. In *Acosta* our Court of Appeals held that "visual observance of the accident is merely one of the ways in which the required 'sensory perception' may occur." 117 N.M. at 30, 868 P.2d at 675. In that case the decedent's brother did not see him electrocuted. However, he heard screams, took no more than 18 seconds to run 322 feet from his office to the scene, and observed his brother's mouth and nostrils smoking, as a result of his electrocution. *Id.* at 29, 868 P.2d 673. The Court set aside the trial court's grant of summary judgment finding that a genuine issue of material fact existed "whether [Acosta] satisfied the 'contemporaneous sensory perception' requirement." *Id.* at 30, 868 P.2d 673.

█ 22 The facts in this case are very different from those in *Acosta*. Although learning that their mother's grave had been disturbed and that her remains were exposed must have been painful for William Jaynes, his brother, and sisters, they did not learn about the desecration through any of their senses. They did not observe their mother's remains nor see her grave in a disturbed state. Although they did observe pieces of her casket on a truck or trailer in the vicinity of Kiro's grave this is not enough to satisfy the "contemporary sensory perception" requirement.

23 In *Flores* we explained that "[n]egligent services may give rise to claims for relief in both ordinary negligence and breach of contract." 117 N.M. at 310, 871 P.2d 962. Following *Flores,* family members may claim relief for ordinary negligence when the contract for funeral services is breached, because in a contract for funeral services the provider of these services "assume[s] contract obligations to use reasonable skill and care to avoid severe mental distress to the family members of the deceased." *Flores* 117 N.M. at 310, 871 P.2d 962.

24 It is the severity requirement which Appellants in this case have failed to allege. In *Flores v. Baca* we said that whether the action for negligent emotional distress is based on tort or based on breach of contract "we believe that compensation for only serious mental distress from breach of contract should be implied in fact as within the contemplation of the parties to a funeral and burial contract." 117 N.M. at 314, 871 P.2d 962. In *Flores,* the decedent's wife "presented evidence of long-term, severe distress ... and her feelings that [her husband's] body was disgraced and dishonored." *Id.* In this case, neither William Jaynes nor his brother or sisters allege severe mental distress. Although the impact on William was clear from the fact that he was unable to enter the cemetery, and had a nephew report back to him the condition of his mother's body, there is nothing in the record that approaches the kind of emotional disturbance suffered by the decedent's wife in *Flores.* We hold that the district court properly granted summary judgment on the issue of negligent infliction of emotional distress.

25 Appellants urge us to consider adopting a tort for a funeral director's negligent infliction of emotional distress. Jurisdictions which recognize this cause of action do not require that a person seeking recovery for negligent infliction of emotional distress have a contemporaneous sensory perception of the negligent act. *Christensen v. Superior Court,* 54 Cal.3d 868, 876, 2 Cal.Rptr.2d 79, 820 P.2d 181, 189 (1991). In *Christensen* the mortuary harvested body parts from decedent's remains and sold them to a biological supply company, and otherwise mishandled human remains. *Christensen v. Superior Court,* 271 Cal.Rptr. 360 (1990) (cited for facts only). The facts of this case do not warrant our reaching the question of whether to recognize a cause of action in tort for a funeral director's negligent infliction of emotional distress. We are not persuaded that even jurisdictions which have adopted this cause of action would extend it to a case such as this one.

26 *Prima Facie Tort.* Lastly, the Appellants argue that the district court erred in granting summary judgment in favor of Strong–Thorne on their claim of prima facie tort. A cause of action for prima facie tort was recognized in New Mexico in *Schmitz v. Smentowski,* 109 N.M. 386, 394, 785 P.2d 726, 734 (1990). In that case we said "[t]o constitute a prima facie tort, the tortfeasor must act maliciously, with the intent to cause injury, and without justification or with insufficient justification." *Id.* at 395, 785 P.2d 726.

One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

Restatement (Second) of Torts § 870 (1977).

27 We conclude that the "intent to cause injury" requirement has not been met in this case. Appellants cite *Schmitz* for the proposition that it is not necessary that the "activity complained of be motivated solely by a malicious intent." *Id.* at 394, 785 P.2d 726. The court in *Schmitz* held that if the activity is motivated by something in addition to malicious intent, such as a desire for economic gain, the intent requirement is nonetheless met. However *Schmitz* did not set aside the malicious intent requirement. We do not believe that there was a malicious intent to injure the Appellants in this case. We hold that Strong–Thorne's conduct does not rise to the level required for a prima facie tort.

28 *Conclusion.* We affirm the district court's grant of summary judgment for

breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress and prima facie tort.

29   IT IS SO ORDERED.

BACA and SERNA, JJ., concur.