2005-NMCA-004

105 P.3d 294

**VALLEY BANK OF COMMERCE, a New Mexico banking association, Plaintiff–Appellant,**

v.

**Jerry and Lois HILBURN, Defendants–Appellees.**

No. 24,204.

Court of Appeals of New Mexico.

Aug. 5, 2004.

Richard E. Olson, James M. Hudson, Hinkle, Hensley, Shanor & Martin, L.L.P., Roswell, NM, for Appellant.

Kenneth R. Wagner, Thomas J. McBride, Wagner, McBride, Ford & Associates, P.A., Martin E. Threet, Martin E. Threet & Associates, Albuquerque, NM, for Appellees.

## OPINION

PICKARD, Judge.

{1} Jerry and Lois Hilburn (the Hilburns) executed a continuing guaranty of debts that Western Auto Rentals and Sales, Inc. (WARS) owed to Valley Bank of Commerce (Bank). When WARS defaulted on a $1.4 million loan, Bank negotiated settlements with WARS and the other individuals who had guaranteed the loan. The Hilburns did not participate in the settlement, contending that they were not liable for the debt. Bank sued the Hilburns for breach of contract and damages in the amount of the debt remaining after the settlement. The Hilburns countersued under a number of theories, including that Bank had orally agreed to return the guaranty before WARS incurred the debt. A jury returned a verdict finding that neither party should recover, and Bank appealed. First, we address a procedural matter. We hold that in jury trial cases, where one of the parties files a post-trial motion for judgment as a matter of law, the time to file a notice of appeal does not begin to run until the trial court enters an order denying that motion. Finding Bank's appeal timely, we address the merits of the appeal. We hold that the jury could have reasonably determined that the Hilburns were released from their guaranty through an oral agreement preceding the disputed indebtedness. On that basis, we affirm the jury verdict.

## FACTS AND PROCEEDINGS

{2} WARS was a business that rented and sold used cars in Roswell, New Mexico. The principals of the business were Ron Peerson, his wife Elly Peerson, Donald "Pug" Thigpen, and his wife Katherine Collier. Also involved in the business were the Hilburns, who provided $625,000 to assist in starting up WARS' operations under a deal that was either a purchase of stock or a loan.

{3} In October 1996, the Hilburns executed an Unconditional and Continuing Guaranty that guaranteed debts that WARS owed to Bank. The guaranty applied to "any and all liabilities, obligations or indebtedness of any kind or nature whatsoever, which now exist or may hereafter arise or accrue in any manner" between WARS and Bank. The guaranty agreement also provided that WARS could incur new debts that the Hilburns would guaranty, and it waived the Hilburns' right to notice of any new debts for which they would be liable. The guaranty agreement also gave Bank the ability to change the terms of the debt, to change or release other guarantors from the agreements, and to release or sell the collateral without affecting the Hilburns' guaranty. The Peersons, Thigpen, and Collier were also guarantors for the debts of WARS.

{4} In order to provide financing for the cars it was selling, WARS created an entity called Western Auto Finance, L.L.C. (WAF). WAF entered into an agreement with Bank that set up the following arrangement. WAF would enter into an installment contract with a consumer who was purchasing a vehicle from WARS. WAF would then sell the installment contract to Bank for face value. WAF would remain responsible for pursuing the consumer if there was a problem with payment, and WAF had a recourse obligation to pay the balance of the installment contract if the consumer did not. WAF and Bank split the interest on the installment contract. Although the Peersons, Thigpen, and Collier were involved in the operations of WAF, the Hilburns were not involved in the operation of WAF or in the relationship between WAF and Bank.

{5} In November 1996, Jerry Hilburn took out a $200,000 personal loan from Bank. That loan was eventually extended, increased to $275,000, and secured by the assets of three video stores that Jerry Hilburn purported to own. In January 2000, Bank determined that Jerry Hilburn did not actually own the assets that he pledged to secure his personal loan.

{6} Both parties agree that in January 2000, Jerry Hilburn had a phone conversation with Bank's president, John Burson (Burson). According to Bank, Burson refused Jerry Hilburn's request to be relieved from the WARS guaranty in return for full payment of his personal note because the two obligations were separate. According to the Hilburns, Burson accepted his offer and agreed to release them from the guaranty in return for full payment of Jerry Hilburn's personal note. Jerry Hilburn did pay his personal debt in full.

{7} In February 2000, Bank extended WARS a loan for $1,553,000, which the parties refer to as "Note 5342." Note 5342 consolidated a series of earlier loans to WARS in order to facilitate one monthly payment.

{8} In July 2000, Jerry Hilburn sent a letter to Bank stating:

This is notice pursuant to the unconditional and continuing Guaranty dated October 29, 1996 and all other similar guarantees signed previous or subsequent relative to Western Automobile Rental and Sales, Inc. or any of its successors, that the undersigned elects not to guarantee any new indebtedness of the Borrower, (Western Automobile Rental and Sales, Inc. or its successors) to Valley Bank which may hereafter accrue.

The letter was signed by Jerry Hilburn only.

{9} WARS defaulted on its obligations to Bank in November 2000. WAF had also fallen on hard times, as more and more installment contracts went into default and increased the debt that WAF owed Bank based on the recourse obligation. Bank called a meeting with the guarantors of the WARS debt in January 2001 in order to negotiate a workout agreement. Jerry Hilburn attended the meeting and participated in the discussions that led to Bank's agreement to reduce the obligations of WAF and WARS by $750,000 in return for a $200,000 payment on the loan. The agreement was made in light of the fact that WARS and WAF were in the process of applying for a government loan to keep the businesses afloat. After the agreement was drafted, Jerry Hilburn refused to sign it. In February 2001, there was a heated phone conversation between Burson and Jerry Hilburn, in which Burson told Hilburn

that if he did not enter into the workout agreement, Bank would enter a workout agreement with the Peersons, Thigpen, and Collier and sue the Hilburns for the balance of the WARS loan.

{10} Bank entered into an agreement with Thigpen and Collier in March 2001, whereby they would borrow $1,450,000 from Bank, secured by a mortgage on their farm and home, and use that money to pay down the WARS and WAF debts. A new entity, New Western Enterprises, would buy the assets of WARS and WAF and would try to secure the government loan to continue operations. In return, Bank agreed not to pursue WARS, WAF, Thigpen, or Collier for the approximately $750,000 of the balance of the WARS and WAF debts. At trial, Thigpen testified that he had made an oral agreement with Bank that the Hilburns would be released from the guaranty on the first note if Thigpen and Collier secured their new loan with their farm and home. However, the written agreement between Thigpen and Collier and Bank contained a provision stating that the agreement would not affect "any and all rights of Bank against Ron and Elly Peerson ('Peerson') or Jerry and Lois Hilburn ('Hilburn') and shall not effect or in any way cause a discharge of Peerson and Hilburn from any liability or obligation to Bank[.]" After the agreement was executed, $627,818.78 of the money that Thigpen and Collier borrowed from Bank was applied to Note 5342, as well as another, separate note. The remainder was used to pay off other debts owed by WARS and WAF.

{11} Bank filed suit against the Hilburns for breach of contract in order to collect the balance due on Note 5342. The Hilburns filed a counterclaim for breach of contract, breach of the covenant of good faith and fair dealing, and a myriad of other claims. After a full trial, the jury returned a verdict stating, "We find neither party should recover." After the district court denied Bank's motion for judgment as a matter of law, Bank appealed.

## DISCUSSION

### 1. Timeliness of Appeal.

{12} In their brief, the Hilburns contended that Bank's appeal should be held to be untimely. Although the Hilburns withdrew this point at oral argument, we proceed to address it because timeliness of the appeal is a mandatory precondition to our jurisdiction. *See Rice v. Gonzales,* 79 N.M. 377, 378, 444 P.2d 288, 289 (1968) (addressing the timeliness issue despite the fact that neither party raised it). On April 17, 2003, Bank filed a timely motion for judgment as a matter of law under Rule 1–050 NMRA 2004. The district court held a hearing on May 28, 2003, and it entered an order denying Bank's motion on June 4, 2003. Bank filed a notice of appeal on July 3, 2003.

{13} According to the Hilburns, Bank's motion for judgment as a matter of law was automatically denied under NMSA 1978, § 39–1–1 (1917), which provides:

Any judgment, or decree, *except in cases where trial by jury is necessary,* may be rendered by the judge of the district court at any place where he may be in this state, and the district courts, *except for jury trials,* are declared to be at all times in session for all purposes, including the naturalization of aliens.... Final judgments and decrees, entered by district courts in all cases tried pursuant to the provisions of this section shall remain under the control of such courts for a period of thirty days after the entry thereof, and for such further time as may be necessary to enable the court to pass upon and dispose of any motion which may have been filed within such period, directed against such judgment; provided, that if the court shall fail to rule upon such motion within thirty days after the filing thereof, such failure to rule shall be deemed a denial thereof[.]

(Emphasis added.) If this interpretation were accurate, Bank's motion would have been deemed denied on May 17, 2003, and Bank's appeal would be untimely under Rule 12–201(D) NMRA 2004. Rule 12–201(D) reads in pertinent part:

D. **Post-trial motions extending the time for appeal.** If a party timely files a motion pursuant to Section 39–1–1 NMSA 1978, Rule 1–050(B), 1–052(B)(2), or 1–059 or a motion pursuant to Rule 5–614 based on grounds other than newly discovered evidence, the full time prescribed in this

rule for the filing of the notice of appeal shall commence to run and be computed from either the entry of an order expressly disposing of the motion or the date of any automatic denial of the motion under that statute or any of those rules, whichever occurs first.

{14} Bank responds that Rule 1–050, which does not include an automatic denial provision, controls the issue. The applicable part of Rule 1–050 reads:

B. **Renewing motion for judgment after trial; alternative motion for new trial.** If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than ten (10) days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 1–059 NMRA. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(a) allow the judgment to stand;

(b) order a new trial; or

(c) direct entry of judgment as a matter of law[.]

. . . .

D. **Denial of motion for judgment as a matter of law.** If the motion for judgment as a matter of law is denied, the party who prevailed on that motion may, as appellee, assert grounds entitling the party to a new trial in the event the appellate court concludes that the trial court erred in denying the motion for judgment. If the appellate court reverses the judgment, nothing in this rule precludes it from determining that the appellee is entitled to a new trial, or from directing the trial court to determine whether a new trial shall be granted.

{15} The Supreme Court amended Rule 1–050 in 1999 in order to conform the New Mexico rule with the Federal Rule of Civil Procedure, which had been amended primarily to change the familiar terminology of "directed verdict" and "judgment n.o.v." to the single term "judgment as a matter of law." *See In re the Amendment of Rules 1–050, 1–085, and 1–099 of the Rules of Civil Procedure for District Courts,* No. 99–8300 (Aug. 10, 1999); 1 James Wm. Moore, *Moore's Federal Rules Pamphlet* § 50.3[1], at 597 (2004). In so doing, the automatic denial provision previously in the rule was deleted. It is not clear to what extent the decision to amend the rules took into account the fact that the federal rules governing post-trial motions generally do not contain an automatic denial provision, whereas the New Mexico rules generally did. *Compare* Fed.R.Civ.P. 50 (providing no automatic denial of post-trial motions for judgment as a matter of law), *with* Rule 1–050 NMRA 1998 (providing automatic denial of post-trial motions for judgment as a matter of law prior to the amendment); *compare* Fed.R.Civ.P. 52 (providing no automatic denial of post-trial motions to amend findings and conclusions), *with* Rule 1–052(D) NMRA 2004 (providing automatic denial of post-trial motions to amend findings and conclusions); *compare* Fed.R.Civ.P. 59 (providing no automatic denial of post-trial motions for a new trial or to amend the judgment), *with* Rule 1–059(D) NMRA 2004 (providing automatic denial of motions for a new trial). The federal rule governing timeliness of appeals also does not contain an automatic denial provision. Fed. R.App. P. 4(a)(4). As one commentator noted, parties in federal court must await an order on a post-trial motion before the time for appeal runs, and this could result in an indefinite waiting period or the need to file a writ of mandamus. David G. Knibb, *Federal Court of Appeals Manual* § 10.4 (2004). This view is inconsistent with New Mexico's policy of automatically denying motions in order to help the district courts manage their dockets and to give parties certainty as to the time they have to file for appeal. *See Martinez v. Friede,* 2004–NMSC–006, ¶¶ 12–13, 135 N.M. 171, 86 P.3d 596.

{16} However, this Court ordinarily construes statutes according to their plain language, unless the result would be absurd or unjust. *See Cordova v. Wolfel,* 120 N.M. 557, 560, 903 P.2d 1390, 1393 (1995). We also construe rules of procedure in the same man-

ner as statutes. *Brewster v. Cooley & Assocs.*, 116 N.M. 681, 684, 866 P.2d 409, 412 (Ct.App.1993). This Court does not have the power to change rules of procedure promulgated by the Supreme Court. *State v. Garcia*, 101 N.M. 232, 235, 680 P.2d 613, 616 (Ct.App.1984). Thus, despite the incongruous nature of the 1999 amendment, we hold that there is no automatic denial of post-trial motions for judgment as a matter of law under Rule 1–050 alone.

{17} Bank also suggests that there is no conflict between Section 39–1–1 and Rule 1–050 in the present case because Section 39–1–1 does not apply to jury trials. On its face, Section 39–1–1 does not appear to apply to jury trials, and a review of our pertinent cases reveals that we have limited our discussion of the applicability of Section 39–1–1 to non-jury trials. *See, e.g., State v. Clemons,* 83 N.M. 674, 675, 496 P.2d 167, 168 (Ct.App. 1972) (analyzing the applicability of this provision when it was codified at NMSA 1953, § 21–9–1 (1917)). The Hilburns suggest that the applicability of Section 39–1–1 is a matter of policy, which we should resolve in favor of applying Section 39–1–1 to all cases.

{18} We hold that Section 39–1–1 only applies to non-jury trials, as its plain language suggests. The case of *Montgomery Ward v. Larragoite,* 81 N.M. 383, 386, 467 P.2d 399, 402 (1970), does not persuade us to the contrary. In that case, the Supreme Court held that appellate courts have jurisdiction to review a case in which the district court did not rule on a post-jury-trial motion for a new trial within 30 days. *Id.* The Court did not hold that Section 21–9–1, the former codification of Section 39–1–1, applied to the case, but merely that it would have governed in a non-jury case. *Id.* The controlling rule in *Montgomery Ward* was Rule 5, NMSA 1953, § 21–2–1(5) (1959), which did contain an automatic denial provision. *Montgomery Ward,* 81 N.M. at 386, 467 P.2d at 402.

{19} Similarly, our holding in *Chavez–Rey v. Miller,* 99 N.M. 377, 658 P.2d 452 (Ct.App. 1982), did not blur the distinction that Section 39–1–1 makes between jury and non-jury trials. In that case, we held that a motion for judgment as a matter of law following a jury trial was automatically denied under an earlier version of the rules of appellate procedure. *Id.* at 381, 658 P.2d at

456. *Chavez–Rey* was decided under Appellate Rule 3(d), the predecessor to Rule 12–201, which did not reference Section 39–1–1 as the current rule does. *Chavez–Rey,* 99 N.M. at 381, 658 P.2d at 456. Instead, Appellate Rule 3(d), like former Rule 5, stated the time for appeal as the earlier of either 30 days after the filing of the motion or the date of the order granting or denying the motion under Rule 1–050. *Chavez–Rey,* 99 N.M. at 381, 658 P.2d at 456. We reasoned that this provision achieved the same result in jury and non-jury trials, *id.,* citing scholarly commentary suggesting that the distinction between jury and non-jury trials for automatic denial purposes was obsolete. *See* Mario E. Occhialino, *Civil Procedure,* 12 N.M. L.Rev. 97, 154 n. 347 (1982).

{20} As discussed above, the Supreme Court amended the Rules of Appellate Procedure subsequent to *Chavez–Rey,* replacing the 30–day automatic denial provision with a reference to Section 39–1–1. Although Rule 12–201(D) points us to the earliest date at which either Section 39–1–1 or Rule 1–050 disposes of the motion, Section 39–1–1 does not apply to jury trial cases. Therefore, we look exclusively to Rule 1–050, which has no automatic denial provision as discussed above. Combining these two rules, we hold that in jury trial cases where one of the parties files a post-trial motion for judgment as a matter of law, the time for filing a notice of appeal does not begin to run until the district court enters an order ruling on the motion. Although this result may seem incongruous in light of New Mexico's policy to generally provide for automatic denials of motions, we believe that it is up to the Supreme Court to conform Rule 1–050 to the other rules. Because there was no automatic denial of Bank's motion for judgment as a matter of law, Bank's notice of appeal, filed within 30 days after the order denying its motion, was timely.

**2. The jury could reasonably have found that the Hilburns had made an oral agreement with Bank to be released from their guaranty and cease liability before WARS obtained the debt at issue.**

[6, 7] {21} Appellate courts review jury verdicts cautiously in order to safeguard a

litigant's constitutional right to a jury trial. *Gonzales v. Sansoy*, 102 N.M. 136, 137, 692 P.2d 522, 523 (1984). We resolve all factual issues in the light most favorable to the jury verdict, disregarding inferences to the contrary. *Id.* In the present case, there were no special interrogatories explaining the basis for the jury's decision. The Hilburns argue that the jury could have found that they made an oral agreement in January 2000 that released them from any liability for debts incurred after that time, which includes the debts at issue in this case. We agree and affirm on this basis.

{22} At trial, the issue of the oral agreement was raised both as a defense to the breach of contract claim and in the context of the Hilburns' counterclaim for breach of contract against Bank. The jury was instructed that the Hilburns had the burden of proving "that on January 18, 2000, Jerry Hilburn and Valley Bank agreed that if Jerry Hilburn pre-paid a personal obligation he owed to the bank, Valley Bank would return the Unconditional Guarantee." It was also instructed that in order to find that Bank had breached a contract to return the guaranty, it must find that there was an oral agreement to release the guaranty in exchange for the Hilburns' payment of Jerry Hilburn's personal note in full, that there was consideration for the agreement, and that the Hilburns paid the personal note in full. If the jury found that Bank had agreed to release the guaranty in January 2000, this could be a basis for finding that the Hilburns had no liability for debts incurred thereafter, including Note 5342.

{23} The jury instructions were legally correct. Although the guaranty on its face required all changes to be in writing, oral modifications to a written contract are permissible under certain circumstances even when the contract specifies that modifications must be in writing. *Medina v. Sunstate Realty, Inc.,* 119 N.M. 136, 138–39, 889 P.2d 171, 173–74 (1995) (stating that a district court erred by excluding evidence of oral modification to a written contract specifying that all changes must be in writing); *Wendell v. Foley,* 92 N.M. 702, 705, 594 P.2d 750, 753 (Ct.App.1979) (holding that there may be oral modification to a written contract specifying that all changes must be in writing). We also reject Bank's assertions that the statute of frauds precludes the Hilburns from asserting an oral agreement because the guaranty is covered by the statute of frauds as an agreement to guaranty the debt of another. Oral modifications to a contract governed by the statute of frauds are permissible if one of the parties materially changes its position in reliance on that modification. *Diversified Dev. & Inv., Inc. v. Heil,* 119 N.M. 290, 300, 889 P.2d 1212, 1222 (1995); *Wendell,* 92 N.M. at 705, 594 P.2d at 753; *accord* Restatement (Second) of Contracts § 150 (1981). Jerry Hilburn testified that he paid off the note in reliance on Bank's promise to return the guaranty. Under these circumstances in which Hilburn changed his position by paying off his personal debt in full, Bank's agreement to release the Hilburns' guaranty and subsequent attempts to collect under the guaranty would be the type of fraudulent activity that the statute of frauds is not intended to protect.

{24} Bank argues that there was no consideration for the agreement based on the "pre-existing duty" rule, reasoning that Jerry Hilburn was already obligated to pay the note in full. *See Jaynes v. Strong–Thorne Mortuary, Inc.,* 1998–NMSC–004, ¶ 11, 124 N.M. 613, 954 P.2d 45 (explaining the pre-existing duty rule). We disagree. The record does not indicate that Bank ever formally put the note in default status. Bank did not call the note due. Unlike the letters that were sent when the WARS note went into default, Bank never gave written notice that Jerry Hilburn's personal note was in default. Because the loan was never formally put into default status, Hilburn had no pre-existing duty to pay it in full. Furthermore, the record indicates that there was adequate consideration to support the oral agreement. At trial, Burson testified that he called Hilburn because Burson believed that Hilburn did not have the right to pledge the collateral that secured Hilburn's personal note. Hilburn disputed the fact that he could not properly pledge the collateral. Instead of pursuing the disagreement, the Hilburns agreed to pay his personal note in a lump sum in

return for termination of the guaranty. The jury could thus have found that Bank agreed to end the Hilburns' liability under the guaranty because it perceived itself to be in an unsecured position with regard to Hilburn's note and because it had the opportunity to receive full payment without the disagreement and difficulty of issuing notice that the debt was in default and attempting to work out an agreement with Jerry Hilburn. This agreement to pre-pay the personal note is adequate consideration for the release of the guaranty. *See Richards v. Allianz Life Ins. Co. of N. Am.*, 2003–NMCA–001, ¶ 19, 133 N.M. 229, 62 P.3d 320 (stating that it is the fact of consideration and not the amount that is determinative and restating the rule that ambiguities are construed to support the judgment).

{25} Finally, the jury could have reasonably found that there was an oral agreement under the jury instructions. Although the law requires that an oral modification to a written contract be proved by clear and convincing evidence, *Powers v. Miller*, 1999–NMCA–080, ¶ 10, 127 N.M. 496, 984 P.2d 177, the jury was not instructed on this heightened standard of proof. Nor was there any request for such an instruction. However, "[e]ven in a case involving issues that must be established by clear and convincing evidence, it is for the finder of fact, and not for reviewing courts, to weigh conflicting evidence and decide where the truth lies." *In re R.W.*, 108 N.M. 332, 335, 772 P.2d 366, 369 (Ct.App.1989). In the present case, both Jerry and Lois Hilburn testified that the phone conversation with Burson established an oral agreement to "return" the guaranty in exchange for full payment of the personal debt. The fact that Jerry Hilburn did completely pay this debt was undisputed, and the jury could have inferred partial performance and reliance on the agreement from this fact. Although Bank suggested that Jerry Hilburn would not have attended the March 2001 settlement negotiation meeting unless he still considered himself to be a guarantor, Hilburn testified that he had been asked to attend as a friend for Thigpen, not as a co-guarantor. The jury was free to disregard or disbelieve the testimony of Bank officials. *Ranchers Exploration &*

*Dev. Corp. v. Miles*, 102 N.M. 387, 390, 696 P.2d 475, 478 (1985) ("It is up to the jury to weigh the testimony, determine the credibility of witnesses, reconcile inconsistent or contradictory evidence, and say where the truth lies.").

{26} At oral argument, Bank emphasized that any evidence supporting the oral agreement was undercut by the July 2000 letter, suggesting that it would not make sense for Jerry Hilburn to send a letter limiting his liability under a guaranty if the Hilburns truly believed that the guaranty had been previously cancelled. Hilburn explained the July 2000 letter by stating that a Colorado attorney advised him to draft the letter when a notice cancelling the guaranty "didn't come in the mail." When there is conflicting testimony, we do not hold that the jury could not have believed one version of the events unless it conflicts with the laws of nature, the result of a simple mathematical calculation, or some other such unmistakable fact. *Larsen v. Bliss*, 43 N.M. 265, 269–70, 91 P.2d 811, 814 (1939). Instead, we defer to the fact finder, who is in a better position to "see a shift of the eyes, sweat, a squirm, a tear, a facial expression, or take notice of other signs that may mean the difference between truth and falsehood." *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 127, 767 P.2d 363, 366 (Ct.App.1988), *modified on other grounds by Delgado v. Phelps Dodge Chino, Inc.*, 2001–NMSC–034, ¶¶ 25–26, 131 N.M. 272, 34 P.3d 1148. The jury in the present case could have believed that Hilburn sent the July 2000 letter because an attorney told him to send it and could have rejected Bank's suggestion that the letter made no sense if there had been a January oral agreement.

{27} Because an oral agreement to return the guaranty in January 2000 would completely relieve the Hilburns of liability, we need not consider any other of the many issues raised by the parties. This finding alone would support the verdict.

**CONCLUSION**

{28} The appeal in this case was timely under Rule 12–201. We affirm the jury verdict, holding that the jury could reasonably

have found that an oral agreement between the Hilburns and Bank relieved the Hilburns of all liability.

{29} IT IS SO ORDERED.

WE CONCUR: JONATHAN B. SUTIN and IRA ROBINSON, Judges.