2007-NMCA-041

157 P.3d 33

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Charles Isaac McCLAUGHERTY,
Defendant–Appellant.**

**No. 24,409.**

Court of Appeals of New Mexico.

Feb. 15, 2007.

Certiorari Granted, No. 30,272,
April 2, 2007.

Patricia A. Madrid, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, NM, for Appellee.

Freedman Boyd, Daniels Hollander & Goldberg P.A., Zachary A. Ives, Albuquerque, NM, Jones Day, John D. Cline, San Francisco, CA, for Appellant.

## OPINION

WECHSLER, Judge.

{1} Our Supreme Court reversed Defendant's convictions in *State v. McClaugherty*, 2003–NMSC–006, 133 N.M. 459, 64 P.3d 486, for the State's improper use of hearsay evidence in the course of cross-examining Defendant. *Id.* ¶¶ 3, 16, 35. The trial prosecutor asked Defendant to comment on alleged statements witnesses made to police relating Defendant's admissions that he shot a gun during the incident. *Id.* ¶¶ 11, 14. On remand to the district court, Defendant promptly moved to bar retrial for prosecuto-

rial misconduct under *State v. Breit,* 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792.

{2} The district court originally dismissed the indictment against Defendant, finding that the prosecutor had misrepresented the contents of the statements. The State timely appealed the dismissal, but later sought to dismiss its appeal and reopen the motion hearing to allow the presentation of other evidence. The district court granted the State's motion to reopen, heard more evidence in a succession of hearings, vacated its dismissal, and ordered a new trial in the case. From this order, Defendant now appeals. First, he asserts that NMSA 1978, § 39–1–1 (1953), operated to deny the State's motions to dismiss the appeal and to reopen the evidence that were pending before the district court by operation of law because more than thirty days elapsed from their filing to their resolution. Because Defendant does not appeal the grant of the State's motion to reopen, we do not address whether that motion was properly granted. Second, Defendant argues that pursuant to the New Mexico Constitution and *Breit,* the district court erred in allowing retrial. We affirm the district court.

## FACTS AND PROCEDURAL BACKGROUND

### The Trial and Appeal to the Supreme Court

{3} Defendant was tried and convicted of a number of serious crimes, including the first-degree (deliberate and felony) murder of Ricky Solisz. The critical issue was whether Defendant "shot," and the only direct evidence of it came from the State's informant. *McClaugherty,* 2003–NMSC–006, ¶¶ 9–10, 133 N.M. 459, 64 P.3d 486. Defendant was the last witness to testify at trial and denied on direct examination that he was armed or fired a gun. *Id.* ¶ 10.

{4} In the cross-examination, the prosecutor, Kenny Montoya, questioned Defendant about his conversations with Sarah Tucker and Sherri Goen immediately after the shooting. When Defendant testified that he told them "I was there and I ran," the prosecutor asked, "Is that all you told them?" At that point, the prosecutor asked Defendant, "You're aware I've got statements?" and

"[W]hy are they lying about you then?" The prosecutor then asked Defendant if he would be surprised that Tucker's and Goen's statements to the police indicated that Defendant admitted to them that he shot during the incident. This questioning continued through defense objections that the prosecutor was eliciting extrinsic evidence and hearsay.

{5} During re-direct examination, Defendant disagreed with the prosecutor's version of those statements and testified that he had read the women's statements and that they contained references to his denying any shooting. The prosecutor objected during the re-direct examination, arguing to the district court that defense counsel was eliciting a lie and stating, "[Defendant] said he shot. Do you want me to let that go? ... They both admit that he said he shot at the guys."

{6} Neither Tucker nor Goen was called to testify at trial, and the statements that they made to the police were never admitted into evidence or presented to the district court. The State did not present rebuttal evidence, and the trial ended. The alleged "admissions" were not mentioned during closing arguments or at any other time during the trial.

{7} The Supreme Court reversed Defendant's convictions and held that the prosecutor's cross-examination constituted an impermissible use of hearsay that sufficiently prejudiced the course of the trial to an extent that required reversal. *Id.* ¶¶ 3, 16, 35. The Supreme Court remanded the case for a new trial. *Id.* ¶ 35.

## Motion to Bar Reprosecution and the State's Appeal

{8} Upon remand for trial from the Supreme Court, Defendant filed a motion to impose a double jeopardy bar to retrial, alleging that the prosecutor had committed misconduct sufficient to trigger Defendant's rights to be free from double jeopardy under the New Mexico Constitution and *Breit,* 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792. Defendant alleged misconduct insofar as the prosecutor improperly used hearsay in the prosecutor's cross-examina-

tion and grossly misrepresented the contents of the statements in his questions. The State denied that the prosecutor had acted in "willful disregard" of the consequences of his actions.

{9} At the May 6, 2003 hearing on Defendant's motion to bar retrial, Defendant introduced the statements Tucker and Goen made to the police, which were admitted as evidence by the district court. The State did not present witnesses or evidence at this hearing. The State conceded that the trial questioning by the prosecutor based on the witness statements was improper, but argued that in the context of the entire trial, such misconduct was isolated, was based on a good faith interpretation of the statements, and consequently did not merit barring reprosecution of Defendant under *Breit.*

{10} The district court reviewed the police statements given by Tucker and Goen and the trial transcript. It found that their statements were that Defendant "did not shoot and was not the shooter" and that the prosecutor had "grossly misrepresented" the content of the statements to the district court during trial. The district court concluded that had it known of the extent of the State's misconduct at the time, it would have granted a mistrial. The district court found that the prosecutor "was actually aware, or must be presumed to have been aware, that his misconduct had the potential to result in a mistrial or a reversal," and that he had made a "conscious and purposeful decision to dismiss any concern" of such a result. The district court granted Defendant's motion, barred reprosecution, and dismissed the indictment with prejudice. The State timely filed its notice appealing this order on May 12, 2003.

### The State's Effort to Reopen the Evidence

{11} On May 27, 2003, the State filed a motion to dismiss the appeal and a motion to reopen hearing as to barring of prosecution. It offered the testimony of the trial prosecutor that it stated "will be in direct contrast to the Court's findings in its Order of Dismissal."

### Remand by the Court of Appeals for Action on the State's Motions

{12} During this same period, Defendant applied to this Court for a dismissal of the State's appeal because the State had not timely filed its docketing statement. *See* Rule 12–208(B) NMRA. We denied the motion to dismiss the appeal and remanded to the district court, directing that if the district court denied the pending motions, the State could file a docketing statement if it still desired to pursue its appeal. This Court did not comment on the effect, validity, or merits of the pending motions.

### The Reopened Hearing

{13} On July 25, 2003, after the State filed its notice of appeal and subsequent motions, and following remand from this Court, the district court granted the State's motions to dismiss the appeal and reopen the case, stating that it had discretion "to hear any additional matters that may not have been raised initially when the motion hearing was heard" on May 6. Defendant objected to this ruling, and the district court commenced to take evidence.

{14} The trial prosecutor testified that his questioning of Defendant was based on Goen's statement of June 19, 1999, as well as a number of other unidentified statements. He agreed that his questioning of Defendant referred to "copies of statements" and that there was no statement by either Tucker or Goen other than the June 19 statements that was ever reduced to writing. He stated that his question—"So why are they lying about you then?"—referred to "all the statements I had in my hand," including other witnesses than Tucker and Goen. He stated that he resumed his cross-examination after Defendant's objection and a bench conference, asking Defendant, "[W]ould it surprise you to hear that [Tucker] gave a statement to the police 6/19/99" and later asking, "How about your roommate, Sherri Goen? Does it surprise you that she also made the same statement[?] . . . That you admitted shooting? . . . Bragged about it?"

{15} The prosecutor testified that Tucker's description of the night of the fight and its inconsistencies gave him his basis for his

question about Tucker. He pointed out that Goen's June 19 statement indicated that Defendant "said he shot them," but conceded that Goen immediately stated to police, "[n]ot him but the guys that are with him," and she then specifically denied that Defendant himself admitted shooting the victim. However, the prosecutor testified that he based his questions on the statement Goen gave in his office in which she said Defendant "bragged about it."

{16} The prosecutor recalled the defense objection and bench conference. He stated, "I think [Defendant's trial attorney] was saying that I was eliciting hearsay and I said I wasn't. I wasn't going to admit the evidence. I just wanted—and [the district court] actually told me how to form it in a better way." "I think it was very important that I knew when I brought those questions up that Sherri Goen was in my office, said that [Defendant] went up bragging that he killed him and it was him. He did the shooting." The prosecutor testified that during re-direct examination of Defendant, his argument to the bench—"He said he shot. Do you want me to let that go? ... They both admit that he said he shot at the guys,"—was based on Tucker's June 19 statement, Goen's June 19 statement, and Goen's pretrial interview in his office.

{17} The State offered an affidavit from Goen dated July 23, 2003, as an exhibit during its redirect examination of the prosecutor, and the defense objected to it as hearsay. The State offered that the affidavit "goes also to Mr. Montoya's reliance on Sherri Goen." The district court admitted the affidavit. It then admitted, without objection, a February 2000 pretrial interview notice as evidence that the prosecutor met with Goen.

{18} The prosecutor testified that Goen had come to the district attorney's office in 2000 and given a pretrial statement:

Myself, a defense attorney was there ... I'm sure I either had a female in there or female coming in because Sherri was a—I believe there's somebody else. I couldn't tell you who it is. Sherri Goen came in, broke down very quick, started crying, saying "I'm very afraid, got to let you know what happened. He came up, he

was bragging that he shot him." He said "we did it." It's very short in her conversation with us because she was so definite that he admitted to not just shooting, but bragging about it. At that point, it stopped. I don't have any notes to show you about it. There's not a tape. I asked Erica Garcia, my old secretary, to look for a tape. The way I usually run things like that, the [d]efense attorney was there, he's taping it himself. I believe, it was Bustamante, the [d]efense attorney and at that time, went out and we agreed on a plea because Ms. Goen was so definite....

{19} The prosecutor stated that a police officer had to be sent to bring Goen in, and that "there were a number of people in that interview." He recalled a defense attorney, Ed Bustamante; a "female;" and "a detective or our own investigator." He testified that this interview lasted less than two minutes. As to the basis for his questions, the prosecutor said that "there was very solid evidence especially with [Tucker] and [Goen], I believe, saying it in front of me, 'He admitted to shooting and he was bragging about we shot them.'"

{20} Defendant's former attorney Ed Bustamante was called as a witness and testified that he represented Defendant in 2000, but did not recall ever being present at a pretrial interview with Montoya and Goen. He testified that it is his practice to record and preserve the recordings of such interviews. He recalled that Goen was "an important witness" and that her interview was "rescheduled a lot," but he did not believe she was ever interviewed.

{21} Other evidence established that the State offered a plea to Defendant on April 27, 2000. Interviews had been scheduled for Goen for February 24, 2000 and August 29, 2000. Montoya sent Bustamante a list of witnesses, including Goen, for an interview he planned to hold on August 16, 2000. The State called attorney Sandra Barnhart y Chavez, who testified that she represented Goen and had been contacted by a faxed subpoena dated August 29, 2000. Barnhart y Chavez recalled that the prosecutor, Goen, and she were the only persons present. The meeting took place for not more than an hour

and was conducted in the prosecutor's personal office. Barnhart y Chavez did not recall the substance of Goen's statement.

{22} Following these hearings, the district court stated that it had come to have doubts as to whether the *Breit* test had been satisfied. The district court remained convinced that if it had the transcripts of the two witness statements at trial, it would have granted a mistrial because it would have considered any curative instruction inadequate, thus meeting that element of the *Breit* test. The district court continued:

> With respect to the third prong, it talks about the prosecutor's acts must be in willful disregard, you know, and [*Breit*] defines what willful disregard means. In other words, I have to ask the question, was he actually aware of the potential consequences of his actions or even if he's presumed to be aware of the potential consequences. And, again, I don't think that it has risen to that level based upon the new information that I received. And certainly in the May hearing, if I'd have had all of this information before me, I think I probably would have been in a better position to make the decision.
>
> ... I don't think that the last two prongs of [*Breit*] have been met. When it talks about the prosecutor in this fashion, it's talking about a prosecutor who knowingly and willfully does something improper; that he or she knows the conduct is improper and knows that a mistrial could result and purposely does that to gain some sort of advantage somehow. And after listening to Mr. Montoya and the other evidence, I don't think that it's come that far.

{23} The district court entered its order on September 29, vacating the May 8 order of dismissal and denying Defendant's motion to bar further prosecution and to dismiss. The district court also certified this case for interlocutory appeal pursuant to NMSA 1978, § 39-3-3(A)(3) (1972), directing the State to draft the appropriate order. Defendant filed his timely notice of appeal of the order.

## THIS COURT'S JURISDICTION OF THIS APPEAL

{24} We initially address the State's motion to dismiss this appeal for lack of jurisdiction. Defendant brings this appeal under *State v. Apodaca*, 1997–NMCA–051, 123 N.M. 372, 940 P.2d 478. *Apodaca* holds that a defendant has a right to directly appeal the denial of a motion to dismiss charges that the defendant claims violate constitutional double jeopardy protections. *Id.* ¶ 17. Under *Breit*, the double jeopardy clause of the New Mexico Constitution bars a retrial if the state has engaged in an extreme level of improper official conduct in the first trial. *Breit*, 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792.

{25} The State contends that *Apodaca* does not apply in this case because Defendant's trial did not end in a mistrial as in *Apodaca* and that, therefore, Defendant's appeal concerns only the district court's ruling on a non-final motion involving prosecutorial misconduct, a due process issue, not double jeopardy. We do not agree.

{26} *Apodaca* grants Defendant the right to directly appeal the district court's order to this Court. *See Apodaca*, 1997–NMCA–051, ¶ 17, 123 N.M. 372, 940 P.2d 478; *see also State v. McDonald*, 2003–NMCA–123, ¶ 24, 134 N.M. 486, 79 P.3d 830 (holding that a denial of a motion to prevent retrial on double jeopardy grounds is "directly reviewable" under *Apodaca*, even when the trial ended with the jury deadlocked on the charges at issue instead of a mistrial), *rev'd in part on other grounds*, 2004–NMSC–033, 136 N.M. 417, 99 P.3d 667. Prosecutorial misconduct and double jeopardy principles are inextricably linked in this context. *See Breit*, 1996–NMSC–067, ¶ 15, 122 N.M. 655, 930 P.2d 792. "[W]hen a trial is severely prejudiced by prosecutorial misconduct, the double-jeopardy analysis is identical, whether the defendant requests a mistrial, a new trial, or, on appeal, a reversal." *Id.; see State v. Lynch*, 2003–NMSC–020, ¶ 1, 134 N.M. 139, 74 P.3d 73 (reversing the denial of a double jeopardy claim against a new indictment on remand). Article VI, Section 2 of the New Mexico Constitution confers the right to appeal from the denial of a motion to bar

reprosecution because the right to be free from double jeopardy is lost if a new trial takes place. *See Apodaca,* 1997–NMCA–051, ¶¶ 15–16, 123 N.M. 372, 940 P.2d 478.

{27} The Supreme Court reversed Defendant's convictions in this case owing to the prosecutor's improper use of hearsay statements in cross-examining Defendant. *See McClaugherty,* 2003–NMSC–006, ¶¶ 3, 16, 35, 133 N.M. 459, 64 P.3d 486. Defendant asserted in his motion that because the hearsay statements as represented at trial by the prosecutor were falsely stated, misleading, and prejudicial to Defendant's rights, the misconduct was sufficient to raise a double jeopardy bar to retrial. The district court granted and then denied Defendant's motion. The denial of the motion below is all that is required by *Apodaca* to confer jurisdiction on this Court to hear an immediate direct appeal. *See State v. Astorga,* 2000–NMCA–098, ¶ 1, 129 N.M. 736, 13 P.3d 468. We have jurisdiction to hear the appeal, and the State's motion to dismiss Defendant's appeal is accordingly denied.

## JURISDICTION OF THE DISTRICT COURT

{28} On May 8, 2003, the district court dismissed the indictment on double jeopardy grounds after its initial hearing on May 6, 2003. The State filed its notice of appeal on May 12, 2003. On May 27, 2003, the State filed two motions in the district court. It moved to voluntarily dismiss its appeal, and it moved to reopen the hearing on Defendant's motion to bar further prosecution. This Court remanded the case to the district court for the limited purpose of ruling on the State's pending motions on July 17, 2003. The district court granted the State's motion to dismiss the appeal and motion to reopen the hearing on barring of reprosecution on July 25, 2003. Subsequently, on September 29, 2003, after a hearing, it entered its order vacating its May 8, 2003 order of dismissal and denied Defendant's motion to bar further prosecution.

{29} Defendant contends that the district court lacked jurisdiction to address the State's motions to dismiss the appeal and to reopen the May 8, 2003 order based on the operation of Section 39–1–1. Section 39–1–1 reads in pertinent part:

> Final judgments and decrees, entered by district courts in all cases tried pursuant to the provisions of this section shall remain under the control of such courts for a period of thirty days after the entry thereof, and for such further time as may be necessary to enable the court to pass upon and dispose of any motion which may have been filed within such period, directed against such judgment; provided, that if the court shall fail to rule upon such motion within thirty days after the filing thereof, such failure to rule shall be deemed a denial thereof[.]

The State contends that Section 39–1–1 did not restrict the district court's ability to act on the State's motion because its notice of appeal divested the district court of jurisdiction to act on issues directed to the district court's ruling on appeal as long as the appeal was pending. The State relies on a line of cases holding that the filing of a notice of appeal removes the case from the district court's jurisdiction except to rule on motions directed to the judgment that are pending at the time of the filing of the notice of appeal, motions in connection with perfecting the appeal, or motions collateral to the judgment. *See Kelly Inn No. 102, Inc. v. Kapnison,* 113 N.M. 231, 241–43, 824 P.2d 1033, 1043–45 (1992).

{30} We therefore must resolve the tension between Section 39–1–1 and case law addressing the effect of the filing of a notice of appeal. We do so as a matter of statutory interpretation that we review de novo on appeal. *State v. Rowell,* 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995).

■ {31} Section 39–1–1 applies to judgments that dispose of a case without a jury verdict. *See Valley Bank of Commerce v. Hilburn,* 2005–NMCA–004, ¶ 18, 136 N.M. 741, 105 P.3d 294. It applies in criminal cases. *See State v. Gonzales,* 110 N.M. 218, 226, 794 P.2d 361, 369 (Ct.App.1990) (applying Section 39–1–1 to the state's motion to reconsider a district court's dismissal of an indictment), *aff'd,* 111 N.M. 363, 805 P.2d 630 (1991).

{32} Substantially similar versions of Section 39–1–1 have been in effect for many years. *See, e.g., Pugh v. Phelps,* 37 N.M. 126, 127–28, 19 P.2d 315, 316–17 (1932) (citing the 1929 version of Section 39–1–1). The original thrust of Section 39–1–1 was to abrogate law that stated that a trial court lost jurisdiction of cases immediately upon filing its final judgment. *See, e.g., Norment v. First Nat'l Bank of Santa Fe,* 23 N.M. 198, 202–03, 167 P. 731, 732 (1917). Section 39–1–1 also reconciled such a rule with the common law rule that judgments were within the control of the court and could be modified until the end of the term of court in which they were issued. *See State v. Neely,* 117 N.M. 707, 708 n. 1, 876 P.2d 222, 223 n. 1 (1994). A long line of cases has described how the abolition of terms of court destroyed the control the district courts once had over their judgments. *See, e.g., Pugh,* 37 N.M. at 128, 19 P.2d at 317. Section 39–1–1 "restored to district courts, during the period of 30 days, the control which they formerly had over their judgments during term time." *Pugh,* 37 N.M. at 128, 19 P.2d at 317 (internal quotation marks and citations omitted); *see also King v. McElroy,* 37 N.M. 238, 243, 21 P.2d 80, 83 (1933) (stating that the district court lost control of its judgments after they were rendered "except for the 30–day period of additional control specified" by Section 39–1–1) (internal quotation marks and citation omitted).

{33} Although Section 39–1–1 has been discussed in the context of jurisdiction, by its language and history, Section 39–1–1 does not grant jurisdiction to the district court, but, rather, limits the period of time that a district court may act on a case over which it has jurisdiction. It is the constitution that grants the district court its jurisdiction. N.M. Const. art. VI, § 13.

{34} Entirely separate from Section 39–1–1, our Supreme Court has clearly limited the ability of the district court to act in a case before it after a notice of appeal is filed. In *Kelly Inn,* 113 N.M. at 240–44, 824 P.2d at 1042–46, our Supreme Court addressed the authority of the district court to rule upon a motion for attorney fees after the filing of the notice of appeal. It stated the general

rule that a district court "loses jurisdiction of the case upon the filing of the notice of appeal, except for the purposes of perfecting such appeal, or of passing upon a motion directed to the judgment pending at the time." *Id.* at 241, 824 P.2d at 1043 (internal quotation marks and citation omitted). It noted exceptions to the general rule when the district court acts on issues "collateral to or separate from the issues resolved in the judgment." *Id.* at 244, 824 P.2d at 1046. It held that the attorney fee issue before it did not require the district court to alter or revise decisions contained in its judgment such that the district court did not lose its ability to rule on attorney fee issues after the filing of the notice of appeal or after the expiration of the thirty-day period of Section 39–1–1. *Kelly Inn,* 113 N.M. at 243–44, 824 P.2d at 1045–46. As a result of *Kelly Inn,* the district court cannot act on a motion filed after a notice of appeal except to perfect the appeal or rule on a matter collateral to the judgment or order on appeal. *Id.* at 244, 824 P.2d at 1046.

{35} In this case, the State filed its notice of appeal before it filed its motions to dismiss the appeal and to reopen the case. Its motion to reopen was directed to the district court's order that was subject to the notice of appeal. The motion to reopen therefore was not collateral to the order subject to the appeal. *See id.* at 241–43, 824 P.2d at 1043–45. Our Supreme Court did not recognize any exception in *Kelly Inn* to the general rule that the filing of the notice of appeal divests the district court of its ability to rule on a motion directed to the judgment or order subject to the appeal that was filed after the notice of appeal. *See id.* at 241–44, 824 P.2d at 1043–46.

{36} Indeed, the lack of such an exception makes sense. Otherwise, a losing party may proceed to attack a judgment both in this Court and in district court, causing inefficiency in the process. This Court recognized such an inefficiency in this case when, after the filing of the notice of appeal and Defendant's motion to dismiss the appeal, it remanded the case to the district court for the limited purpose of ruling on the State's pending motions. At that point, this Court rein-

stated the district court's control of the case with respect to those motions.

{37} Section 39–1–1 does not controvert this analysis. Although Section 39–1–1 limits a district court's time to act on a post-judgment motion, it clearly allows the court to act on such motions. Yet, in the circumstances of this case, in which the State filed its notice of appeal before its motion to reopen, the district court no longer had any ability to act on the motion.

■ {38} We interpret a statute to achieve the result intended by the legislature, and we will not construe a statute in a way that renders its application "absurd, unreasonable, or unjust." *Rowell*, 121 N.M. at 114, 908 P.2d at 1382 (internal quotation marks and citation omitted). New Mexico's earliest cases recognize that jurisdiction of the appellate court attaches on appeal. *See Canavan v. Canavan*, 18 N.M. 468, 470, 138 P. 200, 201 (1914) (stating that jurisdiction of the Supreme Court attached "upon the allowance of the appeal or the issuance of the writ of error"); *Abeytia v. Spiegelberg*, 20 N.M. 614, 617, 151 P. 696, 697 (1915) (stating that the Supreme Court had jurisdiction of the cause upon the allowance of the appeal, the procedure at that time to bring an appeal); *Pankey v. Hot Springs Nat'l Bank*, 42 N.M. 674, 682, 84 P.2d 649, 654 (1938) (same). Our Supreme Court did not even originally recognize a district court's ability to entertain a motion directed to a judgment pending when jurisdiction transferred to the Supreme Court on appeal. *See State v. White*, 71 N.M. 342, 346, 378 P.2d 379, 382 (1962) (stating the general rule that the district court lost jurisdiction except to perfect the appeal was modified to include the right "to pass upon a motion for new trial or modification of the judgment which was pending at the time the appeal was taken"). We do not believe that by enacting Section 39–1–1 or its predecessors the legislature ever intended the inefficiency of dual jurisdiction over the judgment or order on appeal that enables a losing party to file, and the district court to then entertain, motions directed to the judgment or order on appeal once the appellate court has jurisdiction of the case. We will not construe Section 39–1–1 to apply to such motions over which the district court has no ability to act.

{39} The cases upon which Defendant relies are not on point. They recognize that by virtue of Section 39–1–1 a motion can be deemed denied so as to affect the timeliness of an appeal or the record on appeal. *See Wagner Land & Inv. Co. v. Halderman*, 83 N.M. 628, 629–30, 495 P.2d 1075, 1076–77 (1972) (holding, among other holdings sufficient to resolve the appeal, including the lack of jurisdiction of the district court to act after the allowance of the appeal, that findings of fact and conclusions of law were not before the court on appeal because the district court had not acted on a motion to file them within thirty days as required by the predecessor statute to Section 39–1–1); *Nat'l Am. Life Ins. Co. v. Baxter*, 73 N.M. 94, 99–100, 385 P.2d 956, 960 (1963) (*per curiam*) (holding that the district court lacked the authority to act on a motion after the allowance of an appeal and noting that under the predecessor statute to Section 39–1–1 a motion set for hearing but not decided within thirty days would be denied by operation of law); *Chavez–Rey v. Miller*, 99 N.M. 377, 381, 658 P.2d 452, 456 (Ct.App.1982) (holding that the notice of appeal was not timely filed because it was not filed within thirty days of the day the motion for a new trial was deemed denied under Section 39–1–1). But Defendant has not cited any case, and we have found none, in which Section 39–1–1 or its predecessors have been applied to a motion directed to the judgment or order on appeal filed after an appeal has been commenced. *See Halderman*, 83 N.M. at 629, 495 P.2d at 1076 (notice of appeal and motion at issue seeking relief from judgment, or, in the alternative, allowing filing of requested findings of fact and conclusions of law filed on same day); *Baxter*, 73 N.M. at 99, 385 P.2d at 960 (motion at issue filed prior to allowance of appeal); *Miller*, 99 N.M. at 381, 658 P.2d at 456 (motions at issue filed prior to notice of appeal). The district court simply does not have the ability to act on such a motion.

{40} Because the district court could not have acted on the State's motion to reopen the hearing until the appeal was dismissed, it was not deemed denied under Section 39–1–

1. The district court had authority to grant the motion on July 25, 2003.

## MERITS OF MOTION TO REOPEN

{41} Although the dissent argues that the motion to reopen should not have been granted, we do not address the merits of that argument. Defendant did not raise it on appeal. *See, e.g., State v. Rendleman,* 2003–NMCA–150, ¶ 50, 134 N.M. 744, 82 P.3d 554 (stating that issues not raised in appellant's brief-in-chief are deemed abandoned). Although we requested supplemental briefing on the merits of the motion to reopen, we prefer not to reach issues not initially raised by the parties. *See State v. Ferguson,* 111 N.M. 191, 196, 803 P.2d 676, 681 (Ct.App. 1990) ("Courts should not take it upon themselves to raise, argue, and decide legal issues overlooked by the lawyers.").

## MERITS OF MOTION TO BAR RETRIAL

{42} As set forth in *Breit,* under the New Mexico Constitution, we employ a three-part test to establish whether double jeopardy bars reprosecution as a result of prosecutorial misconduct: (1) the improper prosecutorial conduct must be "so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial;" (2) "the official knows that the conduct is improper and prejudicial;" and (3) "the official either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal." *Breit,* 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792; *see State v. Haynes,* 2000–NMCA–060, ¶ 5, 129 N.M. 304, 6 P.3d 1026. On appellate review, the analysis presents a mixed question of law and fact. We defer to the district court when it has made findings of fact that are supported by substantial evidence and review de novo the district court's application of the law to the facts. *State v. Attaway,* 117 N.M. 141, 144, 870 P.2d 103, 106 (1994), *modified on other grounds by State v. Lopez,* 2005–NMSC–018, 138 N.M. 9, 116 P.3d 80; *State v. Armijo,* 118 N.M. 802, 811, 887 P.2d 1269, 1278 (Ct.App. 1994).

{43} Double jeopardy bars reprosecution in only the rare and exceptional occasion; it is an "exceedingly uncommon remedy." *Breit,* 1996–NMSC–067, ¶ 35, 122 N.M. 655, 930 P.2d 792. It applies in only the cases of "the most severe prosecutorial transgressions." *State v. Gonzales,* 2002–NMCA–071, ¶ 14, 132 N.M. 420, 49 P.3d 681. In most circumstances in which a defendant requests a mistrial or retrial based on evidentiary error, a new trial serves to rectify the error.

{44} The district court concluded that the first part of the *Breit* test was met in this case, but that the second and third parts were not. If any of the three parts of the *Breit* test is not met, double jeopardy does not bar retrial. Because we do not believe that the third part has been met, we do not analyze the other parts in this case.

{45} The third part of the *Breit* test requires that the prosecutor "either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal." *Breit,* 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792. Without an intent to provoke a mistrial, "the misconduct necessary to bar a retrial must be extraordinary." *State v. Foster,* 1998–NMCA–163, ¶ 21, 126 N.M. 177, 967 P.2d 852. Defendant does not contend that the prosecutor intended to provoke a mistrial, but instead asserts that the prosecutor acted in willful disregard of the resulting mistrial, retrial, or reversal. According to Defendant, the prosecutor "must be presumed [under *Breit* ] to have been aware that if he injected inadmissible hearsay into the trial and misrepresented out-of-court statements, manufacturing nonexistent confessions by the defendant, a mistrial or reversal could occur." While we agree with Defendant that the prosecutor acted improperly as determined by our Supreme Court and that a prosecutor is presumed to be aware of the potential consequences of the prosecutor's acts under *Breit,* 1996–NMSC–067, ¶ 34, 122 N.M. 655, 930 P.2d 792, we do not agree that the prosecutor's actions in this case meet the extraordinary standard required to bar reprosecution based on double jeopardy concerns.

{46} The cases that hold that a prosecutor engaged in acts in willful disregard of the potential consequences of a mistrial or retrial serve as examples. In *Breit,* the prosecutor's misconduct was pervasive throughout

the trial. It began with unsupported allegations in opening statement, continued throughout the trial despite the district court's direct admonitions, persisted in closing, and even included inappropriate post-trial conduct. *Id.* ¶¶ 41–44. The prosecutor's misconduct involved statements and actions attacking the merits of the defense and defense counsel as well as verbal and nonverbal conduct that affected the atmosphere of the trial. *Id.* ¶¶ 42–44. Our Supreme Court examined the totality of the circumstances of the trial. *Id.* ¶ 40. It relied on the findings of the district court as corroborated by the record. *Id.* ¶ 37. It concluded that although separately the prosecutor's actions would unlikely bar retrial, the conduct was "unrelenting and pervasive." *Id.* ¶ 45. It therefore concluded that to avoid "an acquittal at any cost, it appears that among the costs the prosecution was willing to incur were a mistrial, a new trial, or a reversal on appeal." *Id.* ¶ 48.

{47} In *State v. Huff,* 1998–NMCA–075, 125 N.M. 254, 960 P.2d 342, this Court found that the prosecutor acted in willful disregard of a resulting mistrial, but it concluded that double jeopardy did not bar retrial because the first part of the *Breit* test was not met. *Huff,* 1998–NMCA–075, ¶¶ 22–24, 25, 125 N.M. 254, 960 P.2d 342. The conduct at issue in *Huff* was the continued questioning of a doctor in a criminal sexual contact case about the doctor's post-traumatic-stress-disorder diagnosis of the victim. *Id.* ¶¶ 22–23. The prosecutor knew that the diagnosis was probably not based on sexual abuse involving the defendant and that the diagnosis "was based on incomplete information that did not include the incidents" charged. *Id.* ¶ 22. The district court repeatedly sustained defense objections, held bench conferences, and warned the prosecutor to limit her questions. *Id.* ¶¶ 22–23. Because the prosecutor nevertheless persisted with the questioning, even though she modified it based on the court's concerns, this Court presumed that the prosecutor was aware of the potential for a mistrial from her conduct. *Id.* ¶ 24.

{48} The questioning in this case does not extend to the level of conduct of *Breit* and *Huff.* Although the questioning was improper, it was isolated and was not reflected in other parts of the trial, including closing. *See, e.g., Haynes,* 2000–NMCA–060, ¶ 6, 129 N.M. 304, 6 P.3d 1026. In addition, the district court concluded that the *Breit* test's third prong was not satisfied. The district court heard the prosecutor testify about his interview with Goen in February 2000. He said that his cross-examination was based on all the statements he had before trial, including Goen's statement at this interview. Defendant brought evidence that contradicted the prosecutor's testimony. However, despite these contradictions and inconsistencies in the prosecutor's testimony, the district court found the prosecutor to be a credible witness, stating specifically:

> The Court finds that Mr. Montoya did not know or can be presumed not to have known that the conduct was improper and prejudicial. The Court finds that Mr. Montoya had an honest belief that his questions were proper.

As to the third part of the *Breit* test, the district court stated:

> The Court finds that … Mr. Montoya did not act in willful disregard. That Mr. Montoya['s] misconduct does not appear to be the result of a plan or scheme to inject unfair prejudice into the trial. Nor did Mr. Montoya seek a tactical advantage through his conduct or would the State would have gained [sic] a tactical advantage because of a mistrial.

{49} We must consider Defendant's argument in the context of the trial as a whole. *See Breit,* 1996–NMSC–067, ¶¶ 40, 45, 122 N.M. 655, 930 P.2d 792. The district judge, of course, is in the best position to understand this context, having observed and presided over the trial. *See, e.g., State v. Duffy,* 1998–NMSC–014, ¶ 46, 126 N.M. 132, 967 P.2d 807 ("[T]he trial court is in the best position to evaluate the significance of any alleged prosecutorial errors."). At least in part because of the district judge's participation at trial, we follow established principles of appellate review with regard to factual findings, not substituting our judgment in place of findings of the district court, viewing the evidence in the light most favorable to the district court's ruling, and disregarding

evidence or inferences contrary to the district court's ruling. *State v. Rodriguez*, 2006–NMSC–018, ¶ 3, 139 N.M. 450, 134 P.3d 737; *State v. Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829. We therefore must accept the district court's finding concerning the credibility of the prosecutor.

{50} Although the district court's findings are laced with conclusions of law, we consider its observation that the prosecutor did not seek a tactical advantage and that the State would not have gained a tactical advantage by a mistrial to be significant. These factors were important to our analysis in *State v. Lucero*, 1999–NMCA–102, ¶ 28, 127 N.M. 672, 986 P.2d 468 (declining to bar reprosecution after discovery violation). In that case, in analyzing the type of evidence that would fall within the extraordinary circumstances barring reprosecution, we considered Justice Stevens' concurring opinion in *Oregon v. Kennedy*, 456 U.S. 667, 689–90, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), explaining that, short of deliberate misconduct, a court would normally consider whether the prosecutor's actions eliminated or reduced the probability of acquittal in a case that "was going badly" for the state. *Lucero*, 1999–NMCA–102, ¶ 29, 127 N.M. 672, 986 P.2d 468 (internal quotation marks and citation omitted). We therefore give considerable weight to the district court's belief that the State would not have benefitted from a mistrial. Without such a benefit, we do not conclude that the prosecutor acted in willful disregard of the constraints on his actions.

{51} Nor do we believe, as Defendant argues, that the timing of the prosecutor's questions indicates the prosecutor's willful disregard of the potential consequences of his actions. It is true that when improper questioning occurs late in a trial, it is more difficult to cure. *Cf. Haynes*, 2000–NMCA–060, ¶ 6, 129 N.M. 304, 6 P.3d 1026 ("[D]ouble jeopardy will not bar retrial when the prosecutor's misconduct occurs early in the trial and there is nothing in the record indicating that the prosecution would benefit from a further delay in the matter."); *State v. Pacheco*, 1998–NMCA–164, ¶ 14, 126 N.M. 278, 968 P.2d 789 (noting that there would be no benefit to the prosecution because the mis-conduct "occurred at the very outset of the trial"). Defendant was the last witness to testify at trial, so his cross-examination would logically be at the end of the trial. However, we cannot infer a willful disregard for a mistrial on the part of the prosecutor from the timing of his questions during the trial, given the district court's finding that the State would not have gained a tactical advantage from a mistrial in the case.

{52} Lastly, we note our concern about the State's reasons for initially declining to present evidence opposing Defendant's motion to bar reprosecution. In its motion to reopen, the State asserted that it "did not call Kenny Montoya at the first hearing because it did not believe the [c]ourt would rule in favor" of Defendant. It stated additionally that the prosecutor had recently been appointed to a statewide position. Defendant argued in response that the State should not be entitled to a second chance on the issue. The district court addressed the motion, and we have addressed the district court's ruling on the merits. Nevertheless, we do not condone the State's laxity in its approach. This case involves serious charges, and the State has the responsibility to act commensurately. *Cf. State v. Perkins*, 219 N.J.Super. 121, 529 A.2d 1056, 1059 (1987) (noting that the prosecutor "is expected to prepare [serious charges] accordingly"); Rule 16–103 NMRA ("A lawyer shall act with reasonable diligence and promptness in representing a client.").

## CONCLUSION

{53} Section 39–1–1 did not deny the district court the ability to dismiss the State's appeal and reopen the evidence in connection with Defendant's motion to bar retrial for prosecutorial misconduct. The district court did not err in concluding that double jeopardy protections did not apply. We therefore affirm the ruling of the district court and remand for retrial.

{54} **IT IS SO ORDERED.**

I CONCUR: CYNTHIA A. FRY, Judge.

RODERICK T. KENNEDY, Judge (concurring in part and dissenting in part).

**480**

KENNEDY, Judge (concurring in part and dissenting in part).

{55} I fully concur that we have jurisdiction to hear this appeal, and that Section 39-1-1 does not apply to situations such as we have here. I respectfully dissent from the majority opinion because this uncommon and extraordinary case represents two independent aspects, either of which merit reversing the district court; either to leave its original and proper dismissal of the case intact, or to dismiss the indictment as violating double jeopardy for the prosecutorial misconduct that occurred at trial.

{56} How common is a murder case in which: (1) the prosecution represents at trial that it has two witnesses who heard the defendant confess to committing the crime, yet *refuses* to call either witness at trial; (2) the conviction is reversed for the prosecutor's improper use of statements to the police purportedly given by those two witnesses in his cross-examination of the defendant; (3) at a subsequent hearing to bar reprosecution for prosecutorial misconduct, the State (represented by trial co-counsel) presents no evidence whatsoever, despite the lead trial prosecutor being available to testify at this hearing, but never having been contacted to do so. The district court discovers that the two "incriminating" statements cited by the prosecutor at trial reflect only the defendant's *denials* of committing the crime, rather than any admissions; (4) as a result of being misled as to the contents of the statements, the district court dismisses the case as violating double jeopardy for prosecutorial misconduct, and the State thereafter requests to reopen the hearing in order to have the trial prosecutor testify. The State asserts as grounds that it put on no evidence because it did not "believe the Court would rule in favor in [sic] [D]efendant"; (5) on the day before the hearing to reopen, and three and a half years after the trial, the State has one of those witnesses swear an affidavit that she gave a statement to the lead prosecutor in a previously undisclosed interview with that trial prosecutor, in which she stated that the defendant had admitted that he did not just "shoot" at the incident, but actually "killed [the victim]." The trial prosecutor then testifies he did not contemporaneously record or take notes of this interview, never provided this statement to the defense, but moreover that he never had any intention to call that witness at trial, nor even mentioned the statement to his trial co-counsel until after the case had been dismissed when his original misrepresentation was discovered. While I concur that we have jurisdiction, I must respectfully dissent from the majority. The convergence of intentional action and generally inept practice in this case by the State results in circumstances justifying invoking double jeopardy to ban reprosecution.

## I. REOPENING THE HEARING WAS AN ABUSE OF DISCRETION

{57} The law is well settled that a motion to reopen must cross a threshold of showing a good reason for the requesting party not presenting its case at the first hearing. *See Sena v. N.M. State Police*, 119 N.M. 471, 474, 892 P.2d 604, 607 (Ct.App.1995). The district court's granting the State's motion to reopen was unsupported by the requisite showing by the State and an abuse of discretion meriting reversal resulted.

{58} The evidence presented to the district court on May 6, 2003, included the two statements given to the police by Tucker and Goen on June 19, 1999, and submitted by Defendant. The State did not request a continuance to procure any witnesses or obtain evidence for its case. Montoya was never contacted by the State prior to this hearing, although he was available to testify.

{59} The State's argument at the May hearing conceded that the questioning by Montoya was improper, but asserted it was isolated misbehavior, based on a mistaken interpretation of the statements, and did not merit barring reprosecution of Defendant under *Breit*. The State did not dispute that the June 1999 Tucker and Goen statements in question contained no mention of Defendant admitting that he "shot," nor does the State argue it now. The State offered no explanation of Montoya's misrepresentation of the contents of the statements at trial. The "other" Goen statement, taken by Montoya

himself and by then three years old, was never mentioned at the May hearing—Montoya had never told his trial co-counsel about it. There was no record in Montoya's file of any interview of Goen occurring other than the June 19, 1999, interview. Montoya stated that he had never mentioned this interview to anyone in the district attorney's office until either one or three weeks prior to the July 25, 2003, hearing.

{60} The State rested its case on May 6. *See generally State v. Martin*, 53 N.M. 413, 417, 209 P.2d 525, 528 (1949) ("Webster's New International Dictionary, 2nd. Ed. p. 2124, defines 'rest' in law as follows: 'In practice, to bring to an end voluntarily the introduction of evidence, *the right to introduce fresh evidence, except in rebuttal, being thereupon lost.*' " (emphasis added)).

{61} In May, the district court finally read the witness statements Montoya had declined to offer as evidence at trial. It found that Tucker and Goen's statements were not that Defendant "shot," but that Defendant "did not shoot and was not the shooter." The district court found that it had been misled at trial by Montoya, and that given the witness statements, there was no assumption other than that Montoya should have known that his questioning was "totally improper and that [the questions'] impact on the jury was highly prejudicial." The district court stated that it did not think "that any reasonable prosecutor would have asked those questions after reading those statements to the police." It found that the prosecutor "was actually aware, or must be presumed to have been aware, that his misconduct had the potential to result in a mistrial or a reversal," and that he had made a "conscious and purposeful decision to dismiss any concern" of such a result under *Breit.* The district court dismissed the indictment with prejudice. The district court entered its order on May 8, 2003, dismissing the case for Montoya's misrepresentation of the witness statements and misleading the court.

{62} In moving for leave to reopen to present its entire case, the State never asserted that it wished to present any evidence it could not have presented on May 6. Instead, the State alleged that it had shirked its duty based on a belief that "the Court would [not] rule in favor in [sic] [D]efendant" and that Montoya had been appointed to the National Guard. The State knew this was sub-par justification; when the motion to reopen was heard, State's counsel began by conceding the lack of a good excuse: "Judge, I don't shy away from my responsibility in that I probably should have called Kenny Montoya. I didn't expect the court to assume the worst of Mr. Montoya and I was wrong." Montoya himself testified that after the hearing, in talking with the State's counsel, he was told by his former co-counsel that the latter "didn't believe that motion was going to go anyway, kind of cake walk in and both surprised after that."

{63} Defendant pointed out the State's failure to either procure or present evidence. Defendant further objected that in seeking to reopen the case the State alleged no "legitimate reason for its failure to call Montoya at the May 6 hearing."

{64} Granting of a motion to reopen a case to present evidence not previously offered is within the trial court's discretion. *See State v. Barragan*, 2001–NMCA–086, ¶ 37, 131 N.M. 281, 34 P.3d 1157. The requests should be evaluated against the extent to which the State used due diligence in procuring the evidence and its probable value. *Id.; State v. Padilla*, 118 N.M. 189, 198, 879 P.2d 1208, 1217 (Ct.App.1994) (evaluating motion to reopen against moving party's failure to use due diligence and value of evidence). The standard applies whether the case before the court is there for trial or a motion hearing. *State v. Silago*, 2005–NMCA–100, ¶ 26, 138 N.M. 301, 119 P.3d 181.

{65} On July 25, the district court enunciated its exercise of discretion "to hear any *additional* matters that may not have been raised initially when the motion hearing was heard" (emphasis added) and granted the State's motion to reopen. In this, the district court was wrong. There were no "additional matters" to be heard at all. No finding was made that the State was justified in its request. Reopening the hearing was an abuse of discretion.

**The State Failed to Make a Requisite Threshold Showing to Justify Reopening The Case**

{66} "A movant seeking permission to reopen its case must show some reasonable excuse." *Sena,* 119 N.M. at 474, 892 P.2d at 607. It is a party's primary responsibility to submit to the court "everything necessary for its decision." *State v. Perez,* 95 N.M. 262, 265, 620 P.2d 1287, 1290 (1980). In *Sena,* we stated:

> In considering a party's motion to reopen its case to present additional evidence, the trial court should take into account all relevant factors, including the reason the party failed to initially offer such evidence; whether the opposing party will be surprised or unfairly prejudiced by the additional evidence; whether granting the motion would substantially delay the proceedings; the importance of the evidence to the movant's case; and whether cogent reasons exist to deny the request.

119 N.M. at 475, 892 P.2d at 608; *see also State v. Harrison,* 2000–NMSC–022, ¶ 56, 129 N.M. 328, 7 P.3d 478 (holding that due diligence in obtaining testimony and its probable value are to be considered by appellate court in reviewing trial court's actions); *State v. Ortiz,* 92 N.M. 166, 169, 584 P.2d 1306, 1309 (Ct.App.1978) (holding that where parties failed to give adequate reason for such failure, denying motion to reopen case is not abuse of discretion).

{67} The State did not seek merely to reopen the case to present limited testimony on one issue as was allowed in *Barragan,* 2001–NMCA–086, ¶ 37, 131 N.M. 281, 34 P.3d 1157, or to explain previous testimony. *See State v. Crump,* 97 N.M. 177, 178, 637 P.2d 1232, 1233 (1981) (holding that reopening proper for prosecution's expert to explain technical terms used). This case involves no new "additional" or supplemental evidence, but the entirety of evidence the State failed to present on May 6, 2003. In *Sena* and *Ortiz,* as here, the party seeking reopening of evidence had waived arguments or failed to present its case despite opportunities to do so. *Sena,* 119 N.M. at 475, 892 P.2d at 608; *Ortiz,* 92 N.M. at 169, 584 P.2d at 1309. The clear lesson is that "[a] movant seeking per-

mission to reopen its case must show some reasonable excuse." *Sena,* 119 N.M. at 474, 892 P.2d at 607. No such excuse exists here. A trial court should rely on the party's lack of diligence in denying a motion to reopen. *People v. Monterroso,* 34 Cal.4th 743, 22 Cal.Rptr.3d 1, 101 P.3d 956, 982 (2004) (noting that evidence sought to be presented was indisputably available during trial, and party offered no excuse for not asking for a ruling on its admission prior to the close of evidence). "It is elementary that due diligence requires an attempt to compel the witnesses' attendance." *See State v. Case,* 100 N.M. 714, 718, 676 P.2d 241, 245 (1984); *See Perez,* 95 N.M. at 264, 620 P.2d at 1289; *see also State v. Fernandez,* 56 N.M. 689, 693–94, 248 P.2d 679, 682–83 (1952); *Waldo, Hall & Co. v. Beckwith,* 1 N.M. 182, 182 (1857). "Without such a requirement of excuse, the rule generally limiting testimony to the evidence-taking stage of a trial would hardly be a rule at all[.]" *United States v. Peterson,* 233 F.3d 101, 107 (1st Cir.2000).

{68} The prosecutor handling the May 6 hearing was co-counsel to Montoya at trial, yet did not talk with Montoya until Montoya "initiated a call" to *him* on May 6 after hearing from a reporter that the case had been dismissed. At that time, the prosecutor told Montoya that he had expected a "cake walk."

{69} It is not the role of a court to supply a remedy for the State's unexcused failure to adequately prepare its case. The State clearly appraised its duties under *Breit* from the start; it acknowledged at the beginning of the May 6 hearing that "what is before the Court right now is Mr. Montoya's improper questioning." The prosecutor stated his awareness that the court's inquiry included "whether the prosecutor acted in willful disregard of the resulting mistrial, retrial, or reversal," examining "the prosecutor's conduct in light of the totality of the circumstances of the trial." The State clearly understood the issues, but perhaps not the gravity of its situation.

{70} The May 6 hearing was obviously no "cake walk." *City of Richmond v. Smith,* 101 Va. 161, 43 S.E. 345, 345–48 (1903) (holding city liable for negligence when it issued a

permit to a "cake walk" gone bad). The State made its tactical decisions, lost everything, and then found that it could not deal with the consequences. *See Ortiz,* 92 N.M. at 170, 584 P.2d at 1310. The State all but conceded that it had no sufficient excuse to justify relief beyond the mercy of the court. Where there is no justification for reopening the evidence, it is an abuse of discretion for the district court to reopen the evidence.

## II. WHEN A PROSECUTOR DELIBERATELY TRANSGRESSES PRECEPTS OF TRIAL PRACTICE AND FAIR PLAY THAT HE IS LEGALLY PRESUMED TO KNOW, HE ACTS IN WILLFUL DISREGARD OF THE CONSEQUENCES

{71} The district court found in May 2003 that the prosecutor "was actually aware, or must be presumed to have been aware, that his misconduct had the potential to result in a mistrial or a reversal," and that he had made a "conscious and purposeful decision to dismiss any concern" of such a result. I believe that this is the correct legal standard—that a prosecutor is presumed to be aware of proper conduct. *Lucero,* 1999–NMCA–102, ¶ 24, 127 N.M. 672, 986 P.2d 468. Therefore, when the district court reversed itself in September, finding that prosecutor Montoya was presumed "not to know" or appreciate the consequences of his actions, it erred by incorrectly applying a legal standard injecting prosecutorial good faith.

{72} In this case, it is the prosecutor's legally imputed knowledge that leads to the conclusion that he acted willfully. This is not a matter of weighing the evidence, but legal presumption. The law presumes a prosecutor knows the scope and import of the evidence, and knows the applicable rules of court, of evidence, and professional standards for his conduct. It is by this objective yardstick of his presumed knowledge that the prosecutor's willful disregard of the consequences of his actions are most fairly judged. The district court, trying to establish its presumption that the prosecutor "did not know" things, attempted to ascribe his behavior to subjective attributes such as inexperience and negligence. Unfortunately, the evidence

establishes the prosecutor's extensive experience, and though his conduct fell below minimal levels, the district court's later negative presumption cannot excuse his conduct in this context.

{73} *Breit* is quite definite in excluding prosecutorial "good faith" as an unworkable standard, thereby rejecting the subjectivity allowed under *Kennedy,* 456 U.S. at 674–75, 102 S.Ct. 2083, and instituting an objective standard in which good faith has little or no place. Montoya testified to his extensive experience and the scope of his intentional conduct. This exists together with legal presumptions that he knew what he was doing and acted in reckless disregard of the consequences. The district court's legal errors by failing to apply established legal presumptions to the prosecutor's actions make its ruling incorrect as a matter of law.

{74} The one thing the State asserts in its defense—the "second" Goen statement—is the very thing that Montoya knowingly and purposefully suppressed and refused to present at trial, while attacking Defendant and his counsel as liars and misleading the court as to the nature of the "other statements" he "had in his hand." In fact, the evidence supports the conclusion that he never intended to introduce *any* of the statements as evidence. I would hold that the requirements of *Breit,* 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792, have been met, and that re-prosecution of Defendant is barred by double jeopardy owing to prosecutorial misconduct at trial.

{75} At the bench during his examination of Defendant, Montoya specifically abjured any intention of presenting the statements or their declarants, Tucker and Goen. As a result of Montoya's later testimony, we know that he had no intention of presenting either witness to substantiate any of Defendant's alleged "admissions." At the end of trial, Montoya complained that that defense counsel had "elicited a lie" when Defendant testified that the June 19th statements contained no statements that he had admitted "shooting":

Mr. Montoya: [Defendant] said he shot. Do you want me to let that go?

. . . .

The Court: What does the statement say?

Mr. Montoya: They both admit that he said he shot at the guys.

[Defense Attorney]: The portion I have[,] he specifically asked her, "Did he tell you he shot?" And she said no. If they want to bring her in and try and get the testimony out of her, I suppose that's their decision, but this should have never come in in the first place. [sic]

The Court: Are you asking now to get into that statement? Is that what you're wanting to do?

Mr. Montoya: I just want to show it to them, but I think it's a past point.

The Court: All right. Hang on. You don't have any other witnesses, right?

[Defense Attorney]: No, that's it.

The Court: Do you have any rebuttal?

Mr. Montoya: No, your Honor.

The trial ended.

{76} According to Montoya three years later, it was not the June 1999 statements, but the "statement [Goen] gave in the office" where she said Defendant "bragged about [the shooting]" upon which his questions were based. Montoya recalled, "I think Ms. Aragon [Defendant's trial attorney] was saying that I was eliciting hearsay and I said I wasn't. I wasn't going to admit the evidence." The Supreme Court made it clear that Montoya was dead wrong about whether he was using hearsay.

{77} Montoya explained, "I think it was very important that I knew when I brought those questions up that Sherri Goen was in my office, said that he went up bragging that he killed him and it was him. He did the shooting." The use of this totally undisclosed hearsay statement at trial would have been no less improper than Montoya's use of the other hearsay statements that caused the reversal of defendant's conviction by the Supreme Court in *McClaugherty*, 2003–NMSC–006, ¶ 30, 133 N.M. 459, 64 P.3d 486. No one but Goen and *her* attorney ever knew that Goen was "in [Montoya's] office." Montoya never mentioned this Goen statement from his office at trial until after the case was dismissed in May 2003, although acknowl-edging three years later that it was a "very important statement."

{78} The prosecutor's misconduct necessitated the reversal of Defendant's conviction. The other two *Breit* requirements are that "the official knows that the conduct is improper and prejudicial"; and "the official either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal." *Breit*, 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792; *Haynes*, 2000–NMCA–060, ¶ 5, 129 N.M. 304, 6 P.3d 1026. The majority ignores the second *Breit* requirement dealing with Montoya's knowledge. Because established legal presumptions impute knowledge of proper conduct and procedure, this knowledge becomes an element of whether Montoya conducted himself in disregard of duties he is presumed to know and the consequences of that conduct, I consider some discussion of knowledge requisite to understand the magnitude of Montoya's conduct in his pursuit of Defendant's conviction.

{79} In ruling on the case in September, the district court stated from the bench:

The second prong where the—where the prosecutor states that he must know that his conduct is improper, and I really have some doubts about this particular prong. I mean, it—Mr Montoya came here and testified and said that he believed that what he was doing was proper; that he believed the information backed him up to ask those questions. It may amount to negligence. It may amount to poor lawyering, perhaps inexperience ... being somewhat naive, but I got the impression that he honestly believed that what he was asking at trial was okay and was proper to do.

{80} The district court's impression is irrelevant. First, our Supreme Court recognizes "gross negligence" as a type of prosecutorial misconduct that has resulted in double jeopardy barring reprosecution. *Breit*, 1996–NMSC–067, ¶ 17, 122 N.M. 655, 930 P.2d 792. Declining to call two witnesses who allegedly heard defendant admit to committing the crime, and having the case reversed because of improper use of those

hearsay statements in cross-examination is extraordinarily negligent practice. Until 2003, *no* court knew the real contents of those statements. The added fact that the "statements of admission" referred to by the prosecutor actually *denied* that defendant admitted shooting, and the prosecutor failed to disclose another statement with an even more damning admission for another three years is even worse.

{81} The district court's September final order found "that Mr. Montoya did not know or can be *presumed not to have known that the conduct was improper and prejudicial,*" and "that Mr. Montoya had an honest belief that his questions were proper." (Emphasis added.) The State argues that the district court's finding that Montoya was a credible witness whose "honest belief that his questions were proper" is based on substantial evidence and should end our consideration. That standard is incorrect; the district court erred in conflating Montoya's subjective intent, which is irrelevant under *Breit,* against well established legal presumptions of Montoya's knowledge, which are legally sufficient to satisfy the second *Breit* prong. Even if the prosecutor had a good faith basis for his questions, the statements "should not have been used on cross-examination." *McClaugherty,* 2003–NMSC–006, ¶ 24, 133 N.M. 459, 64 P.3d 486. Furthermore, the Supreme Court was specific in *Breit* as to its "doubt[s that] a claim of lack of experience could lift the bar [to reprosecution] of double jeopardy. Rare are the instances of misconduct that are not violations of rules that every legal professional, no matter how inexperienced, is charged with knowing." *Breit,* 1996–NMSC–067, ¶ 33, 122 N.M. 655, 930 P.2d 792. "The law cannot reward ignorance[.]" *Id.* (internal quotation marks and citation omitted).

{82} *Breit* is based on prosecutorial conduct, not prosecutorial intent. "Honest belief" and its sister "good faith" are subjective considerations that are not relevant when the law objectively presumes prosecutors to possess certain knowledge. *See, e.g., McClaugherty,* 2003–NMSC–006, ¶ 24, 133 N.M. 459, 64 P.3d 486. "Despite the heat of trial, prosecutors must fulfill their responsibility to act professionally." *State v. Andrade,* 1998–NMCA–031, ¶ 29, 124 N.M. 690, 954 P.2d 755. "[E]xigencies of trial and purported judgment calls made under the stress and pressure of trial, cannot be a legal refuge from professional duties and obligations." *State v. Maluia,* 107 Hawai'i 20, 108 P.3d 974, 982 n. 2 (2005) (Acoba, J., concurring) (internal quotation marks and citations omitted). Montoya testified that he was the lead prosecutor in this murder trial. He characterized himself as a prosecutor who had "entered every courtroom" in the Second Judicial District, and who, in the year around the time of Defendant's prosecution, "did more murder trials than everybody else put together in the state." He specifically testified to his knowledge of the case, and acknowledged that prosecutors "live[ ] by a higher standard," and "don't cross the line, we can't. We have to protect too much." An attorney with these qualifications may fairly be presumed to know what he is doing, and his conduct may fairly be judged against objective standards.

## What a Prosecutor May Legally Be Presumed to Know

{83} The district court's ascribing the prosecutor's lack of knowledge to "negligence" or "poor lawyering, perhaps inexperience in handling those types of cases, being somewhat naive" is misplaced. "[T]here must be a point at which lawyers are conclusively presumed to know what is proper and what is not." *Pool v. Superior Court,* 139 Ariz. 98, 677 P.2d 261, 270 (1984) (en banc). Behavior falling short of intentional conduct may be sufficiently egregious to trigger double jeopardy protections. *State v. Lucero,* 1999–NMCA–102, ¶¶ 15–16, 127 N.M. 672, 986 P.2d 468. Reprosecution can be barred even when the prosecutor did not know the conduct was improper and prejudicial. *Id.*

{84} *Huff* provides little refuge to the State. In *Huff,* we held *Breit's* knowledge test was satisfied by presuming knowledge on the part of a prosecutor who introduced "irrelevant, misleading, and prejudicial testimony." *Huff,* 1998–NMCA–075, ¶ 21, 125 N.M. 254, 960 P.2d 342. We stated that prohibitions against proffering evidence with-

out an adequate legal and factual foundation was "not a subtle point of law, and one we can presume any prosecuting attorney to know." *Id.* "A prosecutor should know the rules of evidence. At the very least, a prosecutor should know a fundamental rule of evidence[.]" *Id.* ¶ 18. *Huff* let the prosecutor off the hook only because a mistrial was not required—the other two *Breit* requirements were met. The behavior in *Huff* is not much different in scope than the present case.

{85} The practice of injecting improper matters through cross-examination is so broadly prohibited that a presumption that prosecutors know to avoid the practice is warranted. "It is improper under the guise of 'artful cross examination' to tell the jury the substance of inadmissible evidence." *United States v. Sanchez,* 176 F.3d 1214, 1222 (9th Cir.1999). "The attempt to communicate impressions by innuendo through questions which are answered in the negative ... when the question has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts." *State v. Bartlett,* 96 N.M. 415, 418, 631 P.2d 321, 324 (Ct.App.1981) (internal quotation marks and citation omitted). "A lawyer shall not ... in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence[.]" Rule 16–304(E) NMRA; *State v. Vallejos,* 86 N.M. 39, 43, 519 P.2d 135, 139 (Ct.App.1974) (citing breach of this ethical standard).

{86} We consistently hold that counsel should not argue facts outside the record, looking to ABA Prosecution Standards and other accepted norms as benchmarks by which to gauge prosecutorial conduct. *See State v. Martinez,* 2001–NMCA–059, ¶ 32, 130 N.M. 744, 31 P.3d 1018; *State v. Cooper,* 2000–NMCA–041, ¶ 15, 129 N.M. 172, 3 P.3d 149; American Bar Association, ABA Standards for Criminal Justice: *Prosecution Function and Defense Function* § 3–5.6(b) (3d ed.1993) ("A prosecutor should not knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury."); 2 Michael H. Graham, *Handbook of Federal Evidence* § 611.21 (6th ed. 2006) ("Questions assuming a fact not in evidence on cross-examination often begin with such phrases as ... 'Would it surprise you if I told you.' "); *State v. Marble,* 21 Kan.App.2d 509, 901 P.2d 521, 525 (1995); Bennett L. Gershman, *Prosecutorial Misconduct* § 10:30 (2d ed.2006) (deliberately eliciting inadmissible and prejudicial evidence—backdooring hearsay); Gershman, *supra,* § 11:28 (false and misleading arguments—availability of unused evidence). The National District Attorneys Association, *National Prosecution Standards* § 77.4 (2d ed.1991), states:

> Prior recorded statements which are materially inconsistent with the testimony of a witness may be introduced as substantive evidence of the content of the prior statement *if the person who elicited, witnessed, or recorded the statement is available for confrontation and cross-examination and after the witness has been given an opportunity, under oath, to explain or deny the prior statement.*

(Emphasis added).

{87} "[A] prosecutor may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable." *United States v. Silverstein,* 737 F.2d 864, 868 (10th Cir.1984). "The purpose of the rule is to protect against the danger that a statement of a declarant is unreliable because it is not given under oath by a witness who is present at trial and subject to cross-examination." *McClaugherty,* 2003–NMSC–006, ¶ 17, 133 N.M. 459, 64 P.3d 486; 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 802.02[3], at 802–9 (Joseph M. McLaughlin ed., 2d ed.2006); *Elmer v. State,* 353 Md. 1, 724 A.2d 625, 630–32 (1999) (holding that this "highly prejudicial" practice merited the conviction's reversal).

{88} Our Supreme Court recently held that our 1990 decision in *State v. Flanagan,* 111 N.M. 93, 801 P.2d 675 (Ct.App.1990), imposed a strict prohibition against asking the defendant if another witness is mistaken or lying and established as standard that

such behavior is "categorically improper." *State v. Duran,* 2006–NMSC–035, ¶ 18, 140 N.M. 94, 140 P.3d 515. In *Flanagan,* we held that such questions about *testifying* witnesses might "constitute ... a misleading argument to the jury that the only alternatives are that the defendant or the witnesses are liars." 111 N.M. at 97, 801 P.2d at 679; *Andrade,* 1998–NMCA–031, ¶ 27, 124 N.M. 690, 954 P.2d 755 (holding it improper for prosecutor to ask defendant if the state's witnesses are lying); *State v. La Madrid,* 1997–NMCA–057, ¶ 4, 123 N.M. 463, 943 P.2d 110 (noting that it is improper to impeach with extrinsic evidence of misconduct). Even though Montoya stated he was neither familiar with nor believed in the existence of such a rule, he should be presumed to know that eliciting inadmissible statements and asking the witness on the stand to comment on the veracity of witness statements that are not in evidence is improper, since the only evidence of the statements was the prosecutor's own questioning.

{89} "A prosecutor who cross-examines in the form of leading questions, which he has a right to do, is the witness who testifies before the jury, not the defendant. The questions asked [in this case] were equivalent of testimony by the prosecutor[.]" *Bartlett,* 96 N.M. at 418, 631 P.2d at 324. Worse, during his testimony at the hearing on the motion to reopen, as he did at trial, the prosecutor continued to suggest that it was the defense's duty to present the primary evidence. *But see McClaugherty,* 2003–NMSC–006, ¶ 30, 133 N.M. 459, 64 P.3d 486 ("It was not Defendant's burden to produce the hearsay declarants as witnesses. It was the State's obligation to offer the statements."). Holding a piece of paper purporting to contain a witness's statement and then failing to call its declarant as a witness has been called "reprehensible" because it deprived the defendant the chance to present the true evidence. *United States v. Steele,* 91 F.3d 1046, 1051 (7th Cir.1996); *see also United States v. Beeks,* 224 F.3d 741, 747–48 (8th Cir.2000) (prosecutor's act of inappropriate inquiry was basis for new trial).

{90} The prosecutor had no intention of presenting the statements, stating, "I wasn't going to admit the evidence." *See McClaugherty,* 2003–NMSC–006, ¶ 30, 133 N.M. 459, 64 P.3d 486 (stating that in light of the lack of intent to call the witness, use of their statements was improper). Although he subpoenaed Goen and Tucker for trial, he did not call them, nor expect them to appear. The prosecutor never asked for a warrant for Goen's arrest even though she was under subpoena; he testified that Sarah Tucker would not have been called because "some evidence isn't needed." Montoya specifically turned away from admitting the statements, insinuating that the defense could if it wanted. The fact that he presented their supposed substance anyway should have alerted the district court that allowing the examination was error. *Id.*

{91} "[N]either a prosecutor's good faith belief that some basis for [his or] her question exists nor reassurances to appellate courts drawn from information never presented below will suffice." *United States v. Elizondo,* 920 F.2d 1308, 1313 (7th Cir.1990). Montoya testified that he made no mistake when he asked the questions. Even if the prosecutor had a good faith basis for his questions the statements "should not have been used on cross-examination." *McClaugherty,* 2003–NMSC–006, ¶ 24, 133 N.M. 459, 64 P.3d 486. "The statements made to the police were not used simply to challenge the credibility of a witness's testimony, but to prove that Defendant actually admitted to shooting a gun on that night." *Id.* ¶ 25. Defendant was deprived of the chance to confront the declarants of the statements, or effectively counter the implications arising from the prosecutor's use of them. *See id.* ¶ 30. By July 2003, Montoya could have read our Supreme Court's opinion in *McClaugherty* and adjusted his testimony to accommodate its assessment of his misconduct. The fact that he testified he never had any intention of using these statements is conclusive on the point.

{92} Montoya is clearly presumed by law to know what is improper conduct, particularly as the precepts involved here are neither obscure nor complicated. The fact that he intentionally pursued this conduct, by intentionally refusing to present the true evi-

dence in the case is misconduct that is sufficiently egregious and extraordinary as to justify barring reprosecution in this case. I cannot follow the majority to pass over the second *Breit* issue. The district court erred when it made findings as to Montoya's "belief" that trumped well-established presumptions of his knowledge that are quite reasonable, given the level of experience Montoya said he possessed. These presumptions set the trigger for the third *Breit* prong that existed in *Huff*.

**Given the Prosecutor's Intentional Conduct, He Acted in Disregard of its Consequences**

{93} "[W]hether the prosecutor's conduct amounts to willful disregard of a resulting mistrial, retrial, or reversal, the appellate court will carefully examine the prosecutor's conduct in light of the totality of the circumstances of the trial." *State v. Pacheco*, 1998–NMCA–164, ¶ 14, 126 N.M. 278, 968 P.2d 789 (internal quotation marks and citation omitted); *see also Lucero*, 1999–NMCA–102, ¶ 26, 127 N.M. 672, 986 P.2d 468 (viewing prosecutor's conduct in light of the totality of the circumstances). The State's case at trial was not overwhelming, and the only direct evidence of Defendant's firing a weapon came from the State's informant, Nachima "Nick" Coriz. *See McClaugherty*, 2003–NMSC–006, ¶ 10, 133 N.M. 459, 64 P.3d 486. This compelled the State to attempt to prove no more than that Defendant "shot" during the incident in which Ricky Solisz was killed. The prosecutor testified that his purpose in cross-examining Defendant was to elicit from him as much evidence on the elements of the offenses as he could. Defendant conceded that he was present at the scene, and that he had tampered with evidence. When the examination turned to whether Defendant had "shot," however, the prosecutor found himself stymied when Defendant "wouldn't say he shot, he wouldn't say anybody shot"—to a point where he felt compelled to bring up what he felt were "admissions"—through statements Defendant did not make, or "prior inconsistent statements." The statements made by the prosecutor at trial bear this out.

{94} Montoya's conduct in this regard was deliberate. His testimony showed that he was aware defense counsel "brought up the point to go and show the statement that said basically that no, you really don't know because she never said that, and I felt so strong about it at the time I objected.... I felt so strongly about it, as I said, Ms. Aragon was trying to elicit untruths out of the defendant and let you know I did object in front of the jury." Montoya was clearly attempting to characterize Defendant and his counsel as liars, and specifically refusing to present the statements despite any urging by the district court or the defense to do so. The heat of the moment carried him into foul territory.

{95} In *Huff*, the prosecutor was presumed to know that the foundation of the questions she put to a doctor was based on incomplete information. *Huff*, 1998–NMCA–075, ¶¶ 21–22, 125 N.M. 254, 960 P.2d 342. In *Huff*, the dispositive *Breit* prong was the first: other remedies than a mistrial existed, many involving action by the defense to counter a prosecutorial strategy they knew was in play. *Huff*, 1998–NMCA–075, ¶ 25, 125 N.M. 254, 960 P.2d 342. In this case, Montoya waited until the very end of trial to present the "evidence" of the statements, presumptively knowing that the 1999 statements were contrary to his representations, specifically refusing to offer the evidence itself when the court provided the opportunity, and improperly trying to shift to the burden of production to Defendant. The prejudicial effect of not only asserting an admission, but asserting that Defendant bragged about shooting, is extreme. Montoya is presumed to know the contents of the first statement, and has in effect by asserting matters as fact in the course of asking such leading questions made himself both a witness and representative of the State. Montoya chose his words, and tellingly did not assert any statement that Defendant admitted killing—just shooting. As a result, Defendant was deprived of the chance to confront the declarants of the statements, or effectively counter the implications arising from the prosecutor's use of them. *See McClaugherty*, 2003–NMSC–006, ¶ 30, 133 N.M. 459, 64 P.3d 486.

{96} In *Lucero,* "willful disregard" was held to mean "either that the prosecutor was actually aware, or can be presumed to have been aware, of the potential consequences of his act or omission." 1999–NMCA–102, ¶ 26, 127 N.M. 672, 986 P.2d 468. It involves making a "conscious and purposeful decision by the prosecutor to dismiss any concern that his or her conduct may lead to a mistrial or reversal." *Breit,* 1996–NMSC–067, ¶ 34, 122 N.M. 655, 930 P.2d 792. Prosecutors are presumed to know the rules of ethics, evidence and criminal procedure, as well as know the contents of their files; the conduct here transgressed basic principles of conduct.

{97} Montoya vividly described his frustration with Defendant when Defendant "wouldn't say he shot, he wouldn't say anybody shot"—to a point where he felt compelled to bring up what he felt were "admissions"—through statements the Defendant did not make, or "prior inconsistent statements." *See McClaugherty,* 2003–NMSC–006, ¶ 21, 133 N.M. 459, 64 P.3d 486 (holding that the statements at issue were not prior inconsistent statements). Montoya was quite specific that he wanted to elicit as much out of Defendant's mouth on cross examination as he could. Montoya was attempting to back-door hearsay to insinuate defendant's substantive guilt. *See generally id.* ¶ 18. "The statements made to the police were not used simply to challenge the credibility of a witness's testimony, but to prove that Defendant actually admitted to shooting a gun on that night." *Id.* ¶ 25. Montoya acted with the express purpose to try to have Defendant admit that he shot during the incident where Ricky Solisz was killed, or leave that impression in the jury's mind regardless of its admissibility or truth. The gravity of trying to insinuate Defendant's guilt in this way creates a proportional degree of prejudice to Defendant's right to a fair trial.

{98} The majority's reliance on the district court's finding that the State did not seek a "tactical advantage" at trial, nor would it have gained one by Montoya's misconduct strains credulity. The Supreme Court pointed out that the evidence at trial as to Defendant's "shooting" was not particularly strong. *Id.* ¶ 10. The June 19 statements were never before the district court or the Supreme Court. By lying about the content of the police statements, Montoya certainly tried to gain a tactical advantage. First, Montoya misrepresented statements that plainly stated that Defendant denied ever shooting, and intentionally created the impression that Defendant had admitted shooting. Second, his comments at trial and subsequent testimony overwhelmingly show that Tucker and Goen were witnesses whose statements he did not want to see the light of day, and whom he had no intention of ever calling to testify. Third, given what Montoya tells us was the content of Goen's "secret" statement, that statement goes significantly farther than even Montoya's misrepresentations at trial to establish not just "shooting," but specifically shooting the victim. Montoya did not ever mention Goen's other statement prior, during or after trial—until his misconduct had been discovered three years later.

{99} Montoya did not call these witnesses at trial in his case in chief, and the presumption that he knew the contents of their statements demonstrates why—it would have been disadvantageous to have their recounting Defendant's contemporaneous denials of ever shooting. Instead, Montoya chose to sandbag Defendant at the very end of the trial in a manner that was calculated to gain an advantage and preserve it against discovery of the true nature of the evidence. The advantages gained—asserting Defendant's admission, presentation of false evidence in the guise of statements by absent witnesses, using the prosecutor's own credibility to assert the veracity of Defendant's "admissions" by using improper cross examination—combine to form the final impression the jury had of the case before the end of the trial. The majority gives short shrift to the timing of this misconduct, but given the way Montoya played out his misconduct, the timing is essential to understand how willful the misconduct was, as well as the gravity of its effect on Defendant's right to a fair trial.

**The Timing of the Misconduct Weighs Against the State**

{100} Montoya testified that he made no mistake when he asked his questions. Mon-

toya waited until the very end of trial to present improper hearsay through statements given by witnesses he had not called, had no intent to call, and with which he said he was familiar. Montoya's intent was to imply that Defendant had at some time admitted his guilt to others. We presume his not calling any of the witnesses who might have testified to such strong admissions was a tactical decision. *See, e.g., State v. Gutierrez,* 2005–NMCA–015, ¶ 20, 136 N.M. 779, 105 P.3d 332 ("[W]e do not wish to guess at what ... counsel was doing."). The timing of the prosecutor's actions served to call undue attention to both the substance of his questions—that Defendant had somehow admitted that he had "shot"—and the Defendant's denials. The timing also served to deprive the Defendant of an opportunity to counter the prosecutor's words and the inferences the prosecutor sought for the jury to draw from them. *See Steele,* 91 F.3d at 1051 (holding that it was proper but not prejudicial for a prosecutor to insinuate the existence of a witness statement contradicting the witness's testimony by holding a piece of paper); *Beeks,* 224 F.3d at 748 (reversing conviction when prosecutor asked witness about denial of previous convictions on defendant's employment application to improperly imply defendant's untruthfulness and criminal past).

{101} When misconduct occurs early in a trial, or with time and opportunity to cure the problem, dismissal will not be a suitable remedy. *Cf. Haynes,* 2000–NMCA–060, ¶ 6, 129 N.M. 304, 6 P.3d 1026 (holding that where misconduct occurs early in trial double jeopardy should not generally bar retrial); *Lucero,* 1999–NMCA–102, ¶ 23, 127 N.M. 672, 986 P.2d 468 (holding that misconduct occurred early enough to allow cure short of mistrial); *Foster,* 1998–NMCA–163, ¶ 22, 126 N.M. 177, 967 P.2d 852 (holding that prosecutor's improper opening statement curable because it may have been proper during closing statement and was not egregious enough to bar retrial); *Pacheco,* 1998–NMCA–164, ¶¶ 14–16, 126 N.M. 278, 968 P.2d 789 (holding prosecutor's misconduct merited a mistrial, but since it occurred in opening statements and the prosecutor admitted his error, the conduct was not enough to bar reprosecu-

tion). Our Supreme Court commented that in this trial, "Defendant had no chance to prove that he never made the statements to which the prosecutor referred during cross-examination. Without such an opportunity, the jury was left to assume that Defendant actually admitted that he shot a gun that night." *McClaugherty,* 2003–NMSC–006, ¶ 33, 133 N.M. 459, 64 P.3d 486.

{102} The interjection of these "admissions" left the impression that the prosecutor possessed information about such admissions, when there was no evidence to that effect before the jury. *See, e.g.,* Gershman, *supra,* § 10:30. The central issue was whether defendant "shot." No witness was called to the stand who heard Defendant admit to shooting. Instead, assertions that they had made "statements to police" concerning alleged "admissions" were thrown at the Defendant when he took the stand. We must presume the prosecutor knew the two June 1999 statements did not contain an admission by Defendant, and that their use was improper bootstrapping of hearsay. Even if the questioning had referred to the other Goen statement it would be no less a foul blow. That the conduct—asserting that Defendant had admitted shooting—happened at the very end of trial was certain to affix the impression of Defendant's guilt in the jury's mind more firmly.

{103} The cases that guide us on what level of misconduct is necessary to merit a dismissal of a prosecution following mistrial or reversal continually use language such as "so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial." *State v. Fielder,* 2005–NMCA–108, ¶ 20, 138 N.M. 244, 118 P.3d 752 (internal quotation marks and citation omitted), and constitute "severe prosecutorial transgressions." *Gonzales,* 2002–NMCA–071, ¶ 14, 132 N.M. 420, 49 P.3d 681 (holding that dismissal of cases for misconduct requires egregious conduct that causes actual prejudice).

**CONCLUSION**

{104} I emphasize that this case is truly unusual. The evidence at trial was not conclusive, as the Supreme Court pointed out,

and only one witness, an informant, ever testified that Defendant "shot" during the incident in which Ricky Solisz was killed. The evidence is conclusive that the two statements that Montoya maintained at trial referred to Defendant's admissions did nothing of the sort. The substance of Goen's second statement is not in evidence, and its use would be no less an improper and unconstitutional use of hearsay than the testimonial statements given by her and Tucker on June 19, 1999.

{105} The additional testimony taken from July through September 2003 served to show that our long-standing legal presumptions concerning prosecutorial knowledge of proper standards for conducting trials are well-founded. It is inconceivable to me that given these presumptions, a competent prosecutor with the experience possessed by Montoya would embark upon such a venture into impropriety without knowing the ultimate effect of his actions. The heat of the moment in a weak case is no excuse to strike the foul blow prosecutors are prohibited from striking. *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* The district court erred when it opened the hearing for more evidence, and erred again by abandoning its initial correct reliance on objective legal presumptions concerning the legal system's expectations for prosecutorial conduct, looking to Montoya's "good faith," and ignoring the objective test enunciated in *Breit.*

{106} For either or both of the grounds enunciated above, I would reverse the district court.